**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal Nos. 25-cr-241 (TJK)** |
| | : | **25-mj-181 (GMH)** |
| **v.** | : | |
| | : | |
| **THOMAS WILTON HANCOCK, JR.,** | : | |
| **a/k/a, "Fresh," et al.,** | : | |
| | : | |
| **Defendants.** | : | |

**UNITED STATES' OMNIBUS MEMORANDUM**
**IN SUPPORT OF PRETRIAL DETENTION AS TO ALL DEFENDANTS**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its oral motion that each defendant be detained pending trial.

On August 21, 2025, a federal grand jury in Washington, D.C. returned an eight-count Indictment, charging the following defendants, *inter alia*, with conspiring to distribute and possess with intent to distribute one kilogram or more of a mixture and substance containing a detectable amount of phencyclidine ("PCP") and 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iv), (b)(1)(A)(vi), and 846: Thomas Hancock (hereafter, "Hancock"), Eric Prather (hereafter, "Prather"), Reginald Lassiter (hereafter, "Lassiter"), Darryl Riley (hereafter, "Riley"), Leonard Edwards (hereafter, "Edwards"), Michael Thomas (hereafter, "Thomas"), Defendant-7, and Sarda Smith (hereafter, "Smith"). Count One of the Indictment specifies the following reasonably foreseeable quantities of narcotics for each defendant:

- Hancock and Prather – one kilogram or more of a mixture and substance containing a detectable amount of PCP, 400 grams or more of a mixture and substance containing a detectable amount of fentanyl;

- Lassiter – 400 grams or more of a mixture and substance containing a detectable amount of fentanyl; and

- Riley, Edwards, Thomas, Smith, and Defendant-7 – one kilogram or more of a mixture and substance containing a detectable amount of PCP.

On August 26, 2025, following a coordinated arrest operation, Gerrika Missouri (hereafter, "Missouri") and Melvina Rawlings (hereafter, "Rawlings"), amongst others, were arrested and charged by criminal complaint as follows:

- Missouri and Rawlings:  Conspiring to Distribute and Possess with Intent to Distribute 100 grams or more of a mixture and substance containing a detectable amount of PCP and 40 grams or more of a mixture and substance containing a detectable amount of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(iv), (b)(1)(B)(vi), and 846.

At the defendants' August 26 and 27, 2025 initial appearances, the United States requested the pretrial detention of the below defendants,[1] citing in support thereof the following statutory authority:

- Hancock, Lassiter, Edwards, Riley, and Smith:  18 U.S.C. §§ 3142(f)(1)(B) (an offense carrying a maximum sentence of life imprisonment—specifically, 21 U.S.C. §§ 846, 841(b)(1)(A)(iv), and/or (b)(1)(A)(vi)); and (f)(1)(C) (serious drug felony).

- Prather: 18 U.S.C. §§ 3142(f)(1)(B) (stemming from both 18 U.S.C. § 924(c) and 21 U.S.C. §§ 846, 841(b)(1)(A)(iv), (b)(1)(A)(vi)); (f)(1)(C); and (f)(1)(E) (a felony involving a firearm that is not a crime of violence).

- Missouri:  18 U.S.C. § 3142(f)(1)(C).

---

[1] On August 26, 2025, indicted defendant Michael Thomas was arrested at his Chino, California residence.  That same day, following a contested detention hearing in the United States District Court for the Central District of California, Thomas was held pending trial.  He will be transported to Washington, D.C. for his appearance in the instant matter.

- Rawlings: 18 U.S.C. §§ 3142(f)(1)(C) and (f)(1)(E).

Each defendant faces a rebuttable presumption that no condition or combination of conditions can protect the community, pursuant to 18 U.S.C. § 3142(e)(3)(A). An additional rebuttable presumption applies to Prather, pursuant to 18 U.S.C. § 3142(e)(3)(B), stemming from Count Two, charging him with Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i).

The United States respectfully requests that the following points and authorities, as well as any other facts, arguments, and authorities presented at the detention hearings, be considered in the Court's determination regarding pretrial detention.

## APPLICABLE LAW

Pursuant to 18 U.S.C. §§ 3142(e)(3)(A) and (e)(3)(B), there exists a rebuttable presumption as to all defendants, that no condition or combination of conditions can effectively ensure the defendants' appearances in this case and otherwise protect the community. The United States must establish by clear and convincing evidence that a defendant is a danger to the community. *United States v. Peralta*, 849 F.2d 625, 626 (D.C. Cir. 1988). For a detention decision based upon risk of flight, the United States only need prove by a preponderance of the evidence that there is no condition or combination of conditions that will assure the defendant's appearance as required. *United States v. Vortis*, 785 F.2d 327, 328-29 (D.C. Cir. 1986). Furthermore, at a detention hearing, the United States may present evidence by way of a proffer. *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996).

In considering whether there are conditions of release, which will reasonably assure the safety of any other person and the community, and the appearance of the defendant as required, the Court should consider and weigh the following factors as to each defendant: (1) the nature and

circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his or her history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g). In consideration of these factors, along with the applicable rebuttable presumption, the United States respectfully submits that the defendants' release poses an unmitigable risk to the community's safety.

## SUMMARY OF INVESTIGATION

The instant indictment and complaint pertain to a narcotics trafficking conspiracy centered around the 2900 block of Knox Place SE, which is adjacent to the Woodland Terrace neighborhood of Southeast D.C. and the scene of increased violence in the past year, including approximately five homicides. From August 2024 to July 2025, undercover officers conducted approximately 20 controlled purchases either in the 2900 block of Knox Place SE, or in other D.C. locations chosen by Knox Place traffickers. Over the course of these controlled purchases, all of which were made from Prather, and in two instances, Rawlings, law enforcement purchased approximately 1.8 kilograms of PCP and 900 grams of fentanyl.

Through various investigative methods, including court-authorized Title III wiretaps of Prather (Target Telephone 1, or TT1), Hancock (Target Telephone 2, or TT2), and Riley's (Target Telephone 3, or TT3) telephones over the first half of 2025,[2] investigative agents were able to identify the sourcing of the narcotics sold in and around Knox Place. Specifically, agents identified Prather's intermediate fentanyl source of supply as Lassiter, who in turn obtained fentanyl from Hancock, a Baltimore-based drug trafficker. Separately, agents identified Prather's intermediate PCP sources of supply as Edwards and Riley, while determining that Hancock is also a large-scale

---

[2] The Honorable Randolph D. Moss authorized the interception of wire communications for TT1, TT2, and TT3, in case numbers 25-wt-01 and 25-wt-02.

PCP redistributor. Additionally, through wire intercepts, agents determined that Missouri was one of the primary individuals assisting Prather with storing his narcotics and fulfilling his customers' orders in and around Knox Place.

Hancock's wire intercepts, as well as other evidence obtained through court-authorized search warrants, revealed his collaborators in his own sourcing of narcotics. Specifically, investigators identified Smith as Hancock's business partner and co-financier of a 17-gallon shipment of PCP from Los Angeles, sourced from Thomas, which was intercepted by law enforcement in March 2025. This investigation culminated in a coordinated arrest operation on August 26, 2025, in which 20 firearms, more than two kilograms, in aggregate, of powdered fentanyl, cocaine, and crack cocaine, significant quantities of liquid PCP, and approximately $50,000 were recovered.

## FACTUAL BACKGROUND

Since at least July 2024, Prather was a prolific drug dealer fueling an open-air drug market in the 2900 block of Knox Place in Southeast D.C., which he mobilized with the integral assistance of his co-defendants.  Between August 28, 2024, and July 15, 2025, law enforcement conducted twenty controlled purchases—eighteen from Prather, and two from his associate, Rawlings.  The chart below details each controlled purchase, reflecting Prather's total sale of 905 grams of fentanyl and 1,797 grams of PCP, just to the undercover officer (hereafter, "UC").[3]

| Date | Substance | Weight (g) | Price | Seller |
|---|---|---|---|---|
| 08/28/2024 | Fentanyl | 9.934 | $800 | Prather |
| 09/05/2024 | Fentanyl | 9.998 | $800 | Prather |
| 09/11/2024 | Fentanyl | 9.016 | $1,600 | Prather |
| 09/11/2024 | Fentanyl | 13.654 | N/A | Prather |
| 09/25/2024 | Fentanyl | 26.86 | $1,960 | Prather |
| 10/03/2024 | Fentanyl | 27.51 | $1,960 | Prather |
| | PCP | 0.932 | $20 | |

---

[3] The UC was pretending to be a redistributor purchasing bulk quantities of narcotics for sale to his own customers.

| | | | | |
|---|---|---|---|---|
| **10/15/2024** | Fentanyl | 26.53 | $1,960 | Prather |
| **10/23/2024** | Fentanyl | 57.60 | $3,820 | Prather |
| **10/31/2024** | Fentanyl<br>PCP | 56.29<br>52.24 | $3,920<br>$500 | Prather |
| **11/12/2024** | Fentanyl<br>PCP | 83.61<br>102.02 | $5,040<br>$600 | Prather |
| **11/20/2024** | Fentanyl<br>PCP | 83.73<br>80.484 | $5,040<br>$600 | Prather |
| **12/03/2024** | Fentanyl<br>PCP | 83.49<br>86.485 | $5,040<br>$600 | Prather |
| **12/18/2024** | Fentanyl<br>PCP | 83.93<br>81.896 | $5,040<br>$600 | Prather |
| **01/08/2025** | Fentanyl<br>PCP | 83.27<br>39.536 | $4,200<br>$400 | Prather |
| **01/08/2025** | PCP | 36.712 | $300 | Prather |
| **02/11/2025** | Fentanyl<br>PCP | 27.98<br>169.44 | $1,200<br>$1,800 | Prather |
| **02/26/2025** | Fentanyl<br>PCP | 83.75<br>120.726 | $3,600<br>$300 | Prather |
| **03/27/2025** | Fentanyl<br>PCP | 82.46<br>358.648 | $2,400<br>$3,600 | Prather |
| **06/12/2025** | PCP | 8.472 | $140 | Rawlings |
| **06/17/2025** | Fentanyl<br>PCP | 0.569<br>9.884 | $0<br>$160 | Rawlings |
| **06/24/2025** | Fentanyl<br>PCP | 28.55<br>333.938 | $1,250<br>$2,400 | Prather |
| **07/15/2024** | Fentanyl<br>PCP | 26.58<br>333.938 | $1,400<br>$2,400 | Prather |

Inevitably, this drug operation in the 2900 block of Knox Place SE, invited a rash of violent crime in the area.  Over the duration of the charged conspiracy, from July 2024 to the present, within 1,000 feet of 2926 Knox Place (where one of Prather's stash houses was located), the following violent crimes occurred:  five homicides, four of which stemmed from gun violence; seventeen assaults with dangerous weapons, involving twelve firearms, five of which were fired; five robberies, all but two of which involved guns; and eight burglaries.  Of those, two homicides, five assaults with dangerous weapons, one robbery, and one burglary were committed within just 200 feet of 2926 Knox Place, and all but three (two assaults and one burglary) involved a gun.

But as previewed *supra*, Prather's and his coconspirator's drug activity was not confined to Knox Place.  Law enforcement traced Prather's supply of illegal drugs to other areas of the District of Columbia; to Baltimore, Maryland, where Hancock stored fentanyl and regularly transported it to Prather, either directly or through Lassiter; and ultimately across the country to California, where Thomas arranged for the transport of a 17-gallon PCP shipment to Hancock in March 2025, before law enforcement intercepted it in Topeka, Kansas, as detailed *infra*.

### Indictment Count 2:  Prather's July 6, 2024 Gun Arrest in Prince George's County

On July 6, 2024, at approximately 7:44 p.m., police officers from Prince George's County Police stopped Prather and T.S. after they exited a gray Nissan Versa, with license plate 6GC6285, which was reported stolen.  After police arrested T.S., Prather, who the police advised was free to leave, continuously asked if he could retrieve the gym bag from inside the vehicle.   When the police searched the car, they found a loaded 9mm Kel Tec PF9 pistol in a brown paper bag on the right rear passenger seat, directly behind Prather's seat.  Prather was arrested, and on him, police found $419 in cash and approximately 14.309 grams of cocaine in a clear plastic baggie.

Police continued to search the vehicle and located a gym bag by Prather's seat on the front passenger floorboard. Inside the bag, police located:

- $5,982 in cash,
- Approximately 26.095 grams of Methamphetamine, and
- Approximately 24.581 grams of cocaine.

A separate black bag was located on the right rear passenger seat, next to where police found the firearm. Inside the bag was:

- Approximately 44.101 grams of blue pills stamped with "M," containing fentanyl, and
- Approximately 37.8 grams of a green leafy substance, suspected marijuana.

Prather claimed ownership of all these items, both at the time of his arrest, and subsequently in an intercepted communication, detailed *infra*. License plate readers for the license plate on the vehicle wherein the contraband was found revealed the vehicle was at the intersection of Suitland Parkway SE and Stanton Road SE, Washington, D.C. at 3:35 p.m., *i.e.*, approximately four hours before Prather's arrest.

### *Indictment Counts 1 and 3 Through 8:  Controlled Buys*

*Counts 1 and 3:*  On October 23, the UC purchased approximately 57.60 grams of fentanyl from Prather. On October 22, following the typical pattern, the UC first placed an order for 56 grams of fentanyl, while also reminding Prather about the PCP he wanted to purchase, referring to it as the "Deer Park." Prather stated that the fentanyl was available for purchase, but he was still waiting for the PCP. The UC and Prather then agreed to meet at the Shops at Dakota Crossing, 2438 Market Street NE.

The morning of October 23, Lassiter's cell site location information ("CSLI") showed him in the vicinity of Anthem House in Baltimore, Maryland—Hancock's residence and stash house, detailed *infra*—from approximately 8:02 a.m. to 8:25 a.m. before heading back to D.C. A surveilling officer observed Lassiter leaving the front door of Hancock's trap house, the Anthem House, around 8:22 a.m., as shown below.



Call detail records ("CDR") further illustrated that Prather was again in communication with Lassiter once the order was placed and leading up to the controlled purchase. Per CDR, Lassiter and Prather communicated with one another approximately 21 times from 9:09 a.m. to 11:22 a.m. as Lassiter traveled to D.C.  As shown below, prior to Lassiter's arrival in D.C., surveillance observed Lassiter around 9:41 a.m., at his Hill-Rom job site in Upper Marlboro, Maryland, with his Chevrolet Express work van (hereafter, the "Hill-Rom van").[4]

---

[4] This is a Chevrolet Express van with MD license plate 8AW9957, which is registered to the Hill-Rom company in Prince George's County, Maryland, where Lassiter worked.  During the life of the conspiracy, Lassiter has been observed driving this vehicle, particularly to the 2900 block of Knox Place to drop off narcotics to Prather.



Meanwhile, as Lassiter was traveling towards D.C., at 11:09 a.m., Prather called the UC, advising that he has to first meet his man at Deanwood station. Sure enough, CSLI and pen register data support that Lassiter and Prather met in the vicinity of Deanwood station around 11:21 a.m. before the controlled purchase occurred.

Then, at 11:27 a.m., Prather called the UC on a recorded call via TT1. Prather stated that, "I'm right here by, damn, Deanwood I'm close to Deanwood station" and "I'm about to come now, I'm like 10 minutes away. I'll call you when I pull in the parking lot." The UC and Prather subsequently exchanged recorded calls to locate one another in the parking lot. Based on toll analysis and CSLI, the evidence supports the reasonable inference that Prather needed to meet his supplier—Lassiter—prior to the controlled purchase.  Only once Prather received his supply from Lassiter, he was ready to complete the purchase with the UC.

*Counts 1 and 4*:  On November 12, 2024, the UC purchased approximately 83.61 grams of fentanyl and PCP weighing 272.45 grams with its packaging from Prather. Following the same pattern, the day prior, November 11, the UC called Prather to arrange the purchase, using the same

coded language (the excerpted language refers to the PCP): "The Deer Park. Let me go ahead and get four, four um little bottles of the Deer Park. And then of course you, you going to put that other one in there." Prather confirmed, "Yeah. That's five."

Again, similar to prior controlled purchases, Prather appears to have coordinated with Lassiter to fulfill part or all of the UC's order. On the morning of the contemplated purchase, November 12, 2024, physical and technical surveillance were initiated in the early morning hours. Court-authorized cellphone records of Prather's phone number ("TT1" or "Target Telephone 1") show voice communications between Prather and Lassiter, who was using 202-883-9369, between 5:23 a.m. and 5:28 a.m. At approximately 6:06 a.m., surveilling officers observed a black Ford Fusion in the parking lot across from 2926 Knox Place SE, bearing MD license plate 8AW9957 affixed to the front of the vehicle.  Of note, that is the same license plate that was on Lassiter's Hill-Rom Van.

At approximately 6:18 a.m., law enforcement observed through technical surveillance the Hill-Rom Van driven by Lassiter, entering the parking lot across from 2926 Knox Place SE, Washington, D.C. While the Hill-Rom van was parked, the lights on the black Ford Fusion, visible with no rear license plate, flashed. Shortly thereafter, the driver of the Hill-Rom van—believed to be Lassiter based on physical appearance and prior observations of him driving the Hill-Rom van—exited the van and opened the rear passenger door of the Ford Fusion, leaning inside the vehicle. Lassiter then re-entered the Hill-Rom van and left the area in the van. The below image from technical surveillance captures the Hill-Rom van and Lassiter entering the Ford Fusion. Circled in yellow is Lassiter at the Ford Fusion, and circled in red is the Hill-Rom van parked nearby:



Physical surveillance observed the Hill-Rom van leaving the parking lot and confirmed it was Lassiter's van bearing the tag 8AW9957, the same plate affixed to the front of the Ford Fusion referenced *supra*.

Tolls show three voice communications between Prather and Lassiter, including an answered voice communication at 7:04 a.m. Later in the day, law enforcement surveilled Lassiter at his job site, observing him wearing an outfit consistent with the outfit he was depicted wearing in the early morning hours, when he dropped off the supply in the Ford Fusion.



Tolls for Prather's TT1 show additional calls between Prather and Lassiter, including an outgoing voice call at approximately 11:49 a.m. on the morning of November 12 to Lassiter. Around 11:50 a.m., technical surveillance captured an individual who appeared to be Prather entering the front passenger seat of the Ford Fusion while talking on a cellphone, as reflected in the below screenshot.



CDR reflect that at the time Prather was observed on surveillance retrieving something from the Ford Fusion while on the phone, he was on an outgoing call to Lassiter. Prather then entered a burgundy GMC Yukon, which then left Knox Place around 11:51 a.m. to transport Prather to the buy location where he met the UC at 2350 South Dakota Avenue NE. After the UC paid, in total, $5,640 for the fentanyl and PCP, Prather departed.

*Counts 1 and 5:*  On February 5, 2025, the United States was authorized to commence intercepting Prather's TT1 wire communications on TT1 from February 5 to March 6, 2025. On February 11, 2025, the first buy occurred after interceptions of TT1 commenced. The intercepted communications combined with the controlled buy confirmed Lassiter's role in the fentanyl supply and introduced Prather's PCP suppliers, Edwards and Riley. The UC purchased from Prather

approximately 28.83 grams of fentanyl, with packaging, and PCP weighing 444.85 grams in two glass bottles.

The day prior, the UC placed the order with Prather, requesting an ounce of fentanyl and eight ounces of light-colored PCP. Later in the day, at approximately 8:27 pm, law enforcement intercepted multiple communications between Edwards and Prather regarding the supply of PCP coinciding with the UC's request.  Specifically, in TT1 Session 721, Prather asked Edwards to "…give me an eight…" that he would need "in the morning." The next morning, on February 11, 2025 (TT1, Session 846), Edwards told Prather, "I'm right by my old building…I'm getting someone to pour, pour it now…I'll be right over there." FBI technical surveillance in the vicinity of the 2900 block of Knox Place SE captured Edwards entering and leaving from 2926 Knox Place SE.



While Prather appears to have used Edwards for the PCP component of the transaction, he utilized Lassiter to fulfill the fentanyl order. At 7:18 pm on February 10, in Session 718, Prather called Lassiter to confirm that Lassiter still had the "purple rain," a particular type of fentanyl powder that is lavender-hued, which is precisely what Prather ultimately sold to the UC during this buy, as shown below:



Lassiter confirmed to Prather that he did have what was intended for the controlled purchase. The next morning, at approximately 8:23 am (TT1, Session 826), Lassiter called Prather, the latter of whom had apparently just reacted to police activity in the 2900 block of Knox Place. Prather stated to Lassiter that he had observed police activity in the area and was concerned that they would execute a search warrant at his building. Consequently, Prather took his money and narcotics across the street ("Cuz I was scared…I grabbed all my money and got the fuck" and "I sent everything across the street."), likely referencing Missouri's residence at 2921 Knox Place SE. Lassiter asked specifically about a small amount of narcotics he had left in a teapot; Prather confirmed that the teapot was also moved across the street. Prather began to recall how much fentanyl he had ("I got one, over one cause it was jumping last night. And then two over there. I am going to take one with me" because "…my man is going to call me around 10…").  At 11:09

a.m., Prather then called Missouri (TT1, Session 849), asking her to get "Darren," their tester,[5] a snack, referring to the contents of the teacup.

At approximately 11:30 a.m., the UC arrived at the buy location, 2470 Market Street NE, Washington, D.C. Approximately ten minutes later, Prather arrived along with an associate. At approximately 11:41 a.m., Prather entered the UC's vehicle and exchanged an orange reusable cloth bag containing what later proved to be purple-colored powdered fentanyl, two glass vials of PCP, laundry detergent, dryer sheets, and a cloth rag for a brown paper bag containing $3,000. Below is a still image (turned 90 degrees) of Prather inside the UC's vehicle.  During the recorded buy, Prather told the UC they just tested the "purple rain," and the tester was high all night.



Later that day, Prather contacted Riley to re-up his supply of PCP following the controlled buy. At approximately 3:49 pm (TT1, Session 1063), Prather called Riley to request more "Deer Park"[6] from Riley. Later that evening, at approximately 7:14 pm (TT1, Session 1094), apparently for the purpose of meeting up to deliver the requested resupply, Prather called Riley asking where

---

[5] Law enforcement identified through the investigation, including the intercepted communications, that Darren was an individual struggling with substance abuse addiction, who Prather, Lassiter, Hancock, Missouri, and the co-conspirators used as a guinea pig to test their product before selling to customers.

[6] Deer Park bottles are one of the several common bottles used by the members of this conspiracy to package larger quantities of liquid PCP, in addition to Motts apple juice bottles.

he was; Riley said he could not come back yet, but Prather should call someone else to get "[Riley's] joint for me." Prather told Riley that he would meet him later so that Riley "won't have to ride with the shit."

The next day, at approximately 2:05 pm (TT1, Session 1148), Riley called Prather to let him know he was arriving at 2926 Knox Place. Two minutes later, technical surveillance capturing the 2900 block of Knox Place SE recorded a silver Toyota Camry parking in front of 2926 Knox Place SE. Shortly after, a person matching Prather's physical description and wearing a gray hooded Adidas sweatshirt similar to the sweatshirt Prather apparently wore during the February 11, 2025 controlled buy, exited 2926 Knox Place SE. Prather walked up to the driver's door of the Camry and conducted a hand-to-hand transaction with the occupant. Prather appeared to hand the occupant an item consistent in size with US currency, and the occupant gave Prather a bottle with a yellow cap. Prather returned to 2926 Knox Place SE and the Camry drove away. Below are still images taken from the video during the transaction.



*Counts 1 and 6*:  On February 25, 2025, the UC called Prather at approximately 2:20 pm, asking Prather if "…you got the tools…"  Prather responded, "Nah. My man just got killed on Friday.[7] Ain't nobody selling nothing right now." Prather later stated, "I still got your six in the car, too. So yeah, remember that." Later in the conversation, the UC requested, "…since you ain't got the tools (referring to firearms), so I'll just use that and pick up uh do that straight the do the you know the straight 12. For, get three of them, right?"  Prather responded, "Yeah yeah. I can handle it…"  The UC then asked, "…the price going to be the same on the, on the eight?  On the light?  On the, on the, eight ounces of the PCP?"  Prather asked, "You want light or dark?"  The UC confirmed, "let me do the um, the the light. I get, I get rid of the light like shit though."  Prather confirmed, "Okay, I got you." The UC later asked, "Yeah, so that's that's so that's 42, right?"  Prather responded, "I don't know. I never put the numbers together. I'm just listening to you right now. As soon as I get off the phone with you I'ma put it in." In other words, the UC requested three ounces of fentanyl at the usual price, $1,200, and eight ounces of the light-colored PCP. When he tried to confirm the price, Prather said he would do that after he got off the phone with the UC.

That evening, at approximately 8:25 pm (TT1, Session 3180), Prather called Hancock at Target Telephone 2, or "TT2."   During the call, an unknown male (suspected to be Riley but labeled as UM), used TT1 to speak with Hancock while Prather was audible in the background:

HANCOCK: Hello?

PRATHER: Cuh.

HANCOCK: Marbury.

UM: Yeah hello, this Black. This is Black.

---

[7] Prather is believed to be referencing a February 16, 2025 homicide in the 2900 block of Knox Place, SE, which is also the block in which Prather traffics narcotics.

HANCOCK: What's up bro.

UM: Man, he uh back rejuvenated. (Laughing)

HANCOCK: Oh he alright? That n**** wen't out huh?

UM: Yeah, I put the wa – I put that cold ass water on his neck. That n**** (mimicking noises). I'm like n**** *unintelligible*.

HANCOCK: Ah damn, that n**** was in a deep motherfucking, motherfucking coma just now.

UM: Maaan, I'm telling. I'm like aw nah. He *unintelligible*

HANCOCK: *unintelligible* should've put him in the trashcan.

UM: (Laughing)

PRATHER: (Singing in the background): Put that *unintelligible in the trash can.* Leave *unintelligible* at the door. I'm your trash.

UM: Alright, I just wanted to let you know cuh.

HANCOCK: Alright. Hey, ask him what that motherfucker do to him man.

UM: Alright.

PRATHER: He be, he, he be having amnesia when he come back. No bullshit.

In other words, Prather and "Black" (Riley) informed Hancock that the user who tested the narcotic was so intensely incapacitated, they were in a "coma[.]"

The next day, February 26, beginning at approximately 8:27 am, the UC and Prather exchanged phone calls to establish a meeting place, eventually settling on the Shell Gas Station at 2350 South Dakota Avenue NE.  As the meeting was being finalized, Prather also coordinated with Lassiter, beginning at 8:09 am (TT1, Session 3257):

PRATHER: Hello?

LASSITER: What's up cuz?

PRATHER: Hey, what time you coming down-

LASSITER: *unintelligible*

PRATHER: What time you coming down this way cuz.

LASSITER: (Talking to someone in the background) *unintelligible* nope, not working. Um, I'll probably can be on that side, um, I probably can leave out here by like 12. Why? What you need me to do?

PRATHER: Nah, that's my fault. I need three. That n**** didn't call me till like motherfucking 10 o'clock at night cuz.

LASSITER: Alright, damn. What time he say he coming?

PRATHER: Uh Uh. I probably can call him and tell him to meet me at, uh, 12 or one. Or whatever. One o'clock, two two o'clock, whatever.

LASSITER: Tell tell 'em, tell 'em tell. Tell him one. I'm about to leave out the warehouse probably like right now and then go to unintelligible.

PRATHER: and I'll have it for you as soon as you get there. Alright, I'll make sure.

LASSITER: Alright, I'm on my way.

PRATHER: Alright.

LASSITER: Alright.

Interpreted, Prather asked Lassiter for three ounces of fentanyl, and Lassiter responded that he could meet Prather after 12 pm from work, recommending that Prather schedule the UC meeting at 1 pm. At approximately 11:52 a.m., technical surveillance capturing the 2900 block of Knox Place SE recorded Lassiter entering 2926 Knox Place SE. At approximately 12:30 p.m., Lassiter exited 2926 Knox Place SE. Between this period, Lassiter's Hill-Rom van was observed parked in the parking lot across from 2926 Knox Place SE.

Interwoven with these intercepted communications are the recorded conversations between the UC and Prather. At 8:27 am, Prather, via TT1, texted the UC, "I forgot bro you said you wanted dark or light[.]" At approximately 8:30 a.m., the UC made a recorded call to Prather via TT1, during which, Prather asked, "What's up brother?  I ain't remember if it was, uh, dark or light cuz. I got both *unintelligibl*e right here." The UC confirmed, "Oh the light." Prather later stated, "Hey

my cousin and them got a meeting, man. So it won't be like till one. That's cool?" The UC stated, "Yeah, that's fine. I'll find something to do until then." This is consistent with the above-described timing articulated by Lassiter.

Simultaneous to Prather attempting to finalize his fentanyl supply, he also needed to line up the PCP. At approximately 10:11 am, Prather called Edwards as follows (TT1, Session 3272):

PRATHER: …the Kobe Bryant for me. The number eight.

EDWARDS: Oh, yeah, yeah. Oh, shit. Damn. Alright. I'm glad you said something. Let me make this call now, cuz.

EDWARDS [ended the conversation]: But I got you. I'm about to get on top of that now.

In other words, Prather asked for eight ounces (Kobe Bryant) of PCP. Soon thereafter, at approximately 12:49 pm, Prather called Edwards (TT1, Session 3278):

EDWARDS: Hello?

PRATHER: Yeah, what happened, cuz?

EDWARDS: I'm waitin' on the little man to hit me back. My phone keep fucking up. He texted me. I just sent him a text back so I'm waiting for him to let me know something.

PRATHER: Okay. Alright.

EDWARDS: Alright.

As it became clear that Edwards might be unable to fulfill the order in time, Prather appeared to pivot to Riley. At approximately 12:49 p.m. and 12:50 p.m. (TT1, Sessions 3277 and 3279), Prather, via TT1, called Riley at Target Telephone 3 ("TT3"). Both calls went unanswered. At approximately 12:52 p.m. (Session 3282), Riley, via TT3, called Prather on TT1:

PRATHER: Hello?

RILEY: Yeah. Where the fuck you at? In the building?

PRATHER: Yeah yeah yeah. Well I don't, uh, I don't need the, uh, the other shit. I wanted the um, the deers.

RILEY: I'm already in the parking lot.

21

PRATHER: Alright. I'm about to come over there.

Interpreted, because Edwards could not provide Prather with the PCP, Prather contacted Riley to request the PCP, or "the deers," Soon thereafter, at approximately 12:54 pm, technical surveillance capturing the 2900 block of Knox Place SE recorded a vehicle matching Riley's Volkswagen Atlas parked in the parking lot across from 2926 Knox Place SE. At approximately 1:06 p.m., Prather was observed returning to 2926 Knox Place SE from the direction of the parking lot across from the building. Then, at approximately 1:08 pm, Prather called the UC to inform him of the change in plans regarding the PCP:

UC: Hey's, what's up playboy?

PRATHER: What's up brother. Uh, look cuz, my my light man ain't have nothing.

UC: What's going on?

PRATHER: I said, my light man with the light shit, he ain't have nothing on him. Uh, my dark man had shit.

UC: Alright.

PRATHER: But since you ain't want that –

UC: I mean, what you, what you think then? You –

PRATHER: Yeah, it's only he…I got everything, I bought everything that he had. Well cause I was going to get some for myself too. He only had uh six. That's all he had. I know you wanted, uh, eight of 'em.

UC: So you, so you got six of the dark?

PRATHER: Yeah. If you don't want it, it's cool. I *unintelligible* myself but I wanted to call you-

UC: Alright. Nah nah nah. I'ma, nah. Because you know the next time we get in this situation, I need to know how it is. So I'll take the the the the six dark. And that's going to be the same what, one fifty?  Per ounce?

PRATHER: Yeah yeah. Yeah. Yeah.

UC: Alright cool. Alright. So.

22

PRATHER:  I'm on my way right now. I just wanted to call you and let you know.

UC: Alright, you on the way?

PRATHER:  Uh where you wanna, where you wanna meet up this time?  I know you said that, uh, that parking lot was fucked up around this time. This when a lot of people get off work.

UC: I mean we can, *stutter*, how about we just do, you know, do your gas station right around the corner.

PRATHER: Okay, that's cool. Alright brother. *Unintelligible*

Thus, Prather informed the UC that Prather's "light" PCP supplier, Edwards, was unavailable to supply Prather in time. Prather was able to get six ounces of "dark" PCP from Riley but wanted to confirm with the UC the "dark" PCP, which cost $150 per ounce, was suitable. Prather and the UC at this time agreed to meet at the Shell gas station located at 2350 South Dakota Avenue NE.

Then, finalizing the adjustment in supply, at approximately 1:23 p.m. (TT1, Session 3290), $150 per ounce, via TT1, received an incoming call from Riley, via TT3:

PRATHER: Hello?

RILEY: Yeah. You got water in there?

PRATHER: Yeah.

RILEY: You got water in there?

PRATHER: Yeah, I got you.

RILEY: Bring the water to the door. Bring the water to the door.

PRATHER: Huh?

RILEY: said, bring the water to the door.

PRATHER: Okay

After $150 per ounce agreed to Riley's suggestion, at approximately 1:24 pm, technical surveillance in the 2900 block of Knox Place SE recorded $150 per ounce exiting 2926 Knox Place SE, handing Riley what appeared to be a water bottle, and walking out of the area. Prather was observed carrying a green bag, consistent with the bag given to the UC described *infra*.

Prather then met the UC at the buy location, 2350 South Dakota Avenue NE. Approximately one minute later, Prather was observed arriving in his silver Honda Civic bearing Washington, D.C. temporary registration F7H2B8P4. Prather opened the front passenger door of the UC's vehicle and leaned in through the threshold. Prather provided the UC with a green drawstring bag containing the narcotics. In exchange, UC provided Prather with a brown paper bag containing $3,900. In total, the narcotics came out to be approximately 83.75 grams of fentanyl, as well as approximately 120.73 grams of PCP, after lab testing.

*Counts 1 and 7*:  On March 26, 2025, at approximately 8:44 a.m., Prather, via TT1, placed an outgoing call to Lassiter (TT1, Session 6414):

LASSITER: What's up cuz?

PRATHER: Hey cuz. Uh, you got that that's only one that's inside the Benefiber uh package?

LASSITER: That's probably like one and some change.

PRATHER: Okay. What uh what time you was coming down this way?

LASSITER: Oh. Tonight. What time you need to get it?

PRATHER: Yeah, I need two more. I got the money for you and everything.

LASSITER: Alright. I'ma see if Fresh bring one down. So you need one more outside of that one or two more?

PRATHER: I need two more, so I need three. So that one and two.

In other words, Prather contacted Lassiter for a resupply of fentanyl requested by the UC, but because Lassiter was out of town, as corroborated by Lassiter's CSLI, he would have Hancock, a/k/a "Fresh"[8] handle the supply.

The same day, at approximately 11:07 a.m., the UC placed a recorded call to Prather, via TT1. The call was intercepted (TT1, Session 6423) as well as verified by reference to the UC's phone's recording software log. Below are excerpts from the call:

> PRATHER: I couldn't get the um I couldn't get the uh light uh that's all they had was dark but that that's what I already had. I'll bring it with me just to show you what it look like. The shit that I got.

> UC: I mean it's all good. You got you got uh you got 16 of it, right?

> PRATHER: Nah, I have eight. They ain't have that much.

> UC: Oh you only got eight? Alright.

> PRATHER: Yeah.

> UC: Well I mean so that's gonna still be, um, 150 right?

> PRATHER: Yeah, yeah. Look though-

> UC: Alright I mean you still got, go ahead.

> PRATHER: If I, if I get the other eight, I'll call you and let you know so I can bring it.

> UC: So you got the you you gonna have the tre and everything right?

> PRATHER: Oh yeah yeah I always got that.

> UC: Alright well I mean you know I'm waiting I'm waiting on you whenever, how long how long?

> PRATHER: I'm waiting for my cousin to, um, go on his lunch break.

This conversation reflects that Prather informed the UC that his PCP supplier only had eight ounces of PCP so he could not get the requested 16 ounces. Prather told the UC he had to wait on his

---

[8] From Hancock's own intercepted TT2 calls in addition to the United States' review of his Cash App and iCloud returns, agents ascertained that Hancock's nickname is "Fresh."

"cousin," consistent with Prather's attempts to obtain the two ounces from Lassiter and Hancock (TT1, Session 6414).

Then, at approximately 12:26 pm (TT1, Session 6427), Prather began trying to firm up the deal: Prather, via TT1, received an incoming call from Lassiter at 202-883-9369. Below are excerpts from the conversation:

LASSITER: Yeah, Brodie said he gonna bring it up there to you.

PRATHER: Okay. You know what time he coming cuz? I got the n**** waiting for me.

LASSITER: I do not know.

PRATHER: Okay text *unintelligible*

LASSITER: I'ma text you his number.

In other words, Lassiter informed Prather that he spoke with his fentanyl supplier—later determined to be Hancock—who would deliver it to Prather at an unknown time.

At approximately 12:36 p.m. (TT1, Session 6428), Prather, via TT1, placed an outgoing call to Hancock at TT2. Below are excerpts from the conversation:

HANCOCK: Marbury.

PRATHER: What's up with you bro? Hey, what time you think your gonna be? *Unintelligible*

HANCOCK: What's up bro?

PRATHER: Nothing. Just chilling.

HANCOCK: Um.

PRATHER: Cause I got, I got the dude waiting for me.

HANCOCK: I can't say a time right now cause I'm actually waiting for my people uh out of town. I gotta pick up in the, from the airport in like probably 20, 30 more minutes. So.

PRATHER: Okay. Okay.

HANCOCK: Soon as I finish with them, and settle them, I'll hit you and say I'm coming down.

Approximately three hours later, at approximately 3:36 p.m., the UC placed a recorded call to Prather, via TT1.

>UC: You forgot about me dawg?

>PRATHER: I'm waiting for my man. Nah. Nah, I'm waiting for my man to bring me the shit cuz. I ain't forget about you.

>UC: Aw man.

>PRATHER: Yeah

>UC: Well look um

>PRATHER: Yeah

>UC: Well yeah it's you wanna do it tomorrow then? I mean hopefully he come through tomorrow.

>PRATHER: Nah nah he'll come through today, but I don't want to have you out there like that. So yeah, tomorrow would be better man and I apologize for for the shit man.

>UC: Alright well can you see if um you can get that other eight then?

>PRATHER: Yeah, I will. I have it, I have it.

>UC: Alright yeah see if you can get the other eight in, alright yeah I'll I'll holler at you tomorrow.

In other words, the meet between Prather and the UC was rescheduled for the next day, March 27, 2025, and in the meantime, Prather would attempt to obtain eight more ounces of PCP.

Approximately an hour and nine minutes after the call with the UC, Lassiter contacted Prather (TT1, Session 6452). During the call, Lassiter asked, "Hey, did you talk to him?" Prather initially responded, "Yeah, I told the n**** tomorrow," but then added, "You talking about Fresh. Yeah, he said he don't know when he'll be down here. Sometime today." Interpreted, during this call, Lassiter wanted to confirm Prather had talked with Hancock, a/k/a "Fresh." Prather confirmed that Hancock would be coming "sometime today," but he told the UC they would meet tomorrow.

On March 26, 2025, at approximately 3:19 p.m., Hancock was observed exiting his stash house, Anthem House, in Baltimore.  At approximately 5:31 p.m., Hancock contacted Prather (TT1, Session 6457) and asked for Prather's location, to which Prather responded, "On Knox." Between approximately 5:35 p.m. and 5:39 p.m. (TT1, Sessions 6458-6460), Prather received three incoming calls from Hancock. All three calls went unanswered or to voicemail. At approximately 5:39 p.m., FBI technical and physical surveillance in the vicinity of the 2900 block of Knox Place SE observed a white BMW sedan, bearing Virginia license plate THF8884, parking across the street from 2926 Knox Place SE.  Shortly thereafter, Hancock was observed exiting from the vicinity of the BMW and subsequently entering 2926 Knox Place SE.  Hancock exited 2926 Knox Place SE at approximately 5:47 p.m. After interacting with several people on the block, Hancock entered the driver's seat of the BMW and departed the area.

*Counts 1 and 8*:  On July 8, 2025, at approximately 5:30 pm, the UC placed an outgoing call to Prather to arrange a narcotics purchase, and in sum and substance, Prather provided details of his new stash location which he described as follows: "you got the police station, Alabama avenue, then me right across the street." One week later, on July 15, 2025, the FBI and MPD conducted a controlled narcotics purchase utilizing the UC in the vicinity of Prather's new stash location, 2474 Alabama Avenue SE, which is approximately two blocks away from Prather's other stash location at 2926 Knox Place SE.

That afternoon, the UC made initial contact with Prather at approximately 12:25 pm, in front of 2474 Alabama Ave SE. Shortly thereafter, Prather opened the main door of the building to allow the UC access, then subsequently led the UC into Apartment 101. Prather walked to a back room in the apartment, exited shortly thereafter, and provided the UC with another water bottle containing approximately 16 ounces of PCP (net weight was identical to the June 2025

controlled purchase with Prather, 333.94 grams), as well as approximately 26.58 grams of fentanyl, in exchange for $3,800.

### _Count 1:  Hancock's Attempt to Acquire 17 Gallons of PCP from California Suppliers_

From around December 2024 and continuing through March 2025, Hancock, with the guidance and financial assistance of Sarda Smith, arranged for Thomas to procure and send bulk quantities of PCP from California to Mr. Hancock.

Before the transport of PCP, on December 12, 2024, Hancock and Smith flew to California to meet Thomas.  Beforehand, as reflected in Hancock's iCloud messages, Sarda Smith secured the flight and hotel in Los Angeles, and further obtained $100,000 from bank accounts, including in cash and cashier checks.  Roughly three months later, between March 25 and 26, 2025, Thomas traveled from Ontario, California to Baltimore, Maryland to complete the PCP transaction with Mr. Hancock.  Meanwhile, Thomas provided approximately 17 gallons of PCP to a courier to drive the potent substance from California to Baltimore.

But, on March 26, 2025, at approximately 5:54 p.m. (ET), Kansas police stopped the truck Mr. Smith was driving.  During the stop, a K9 Officer completing an exterior scan of the vehicle advised that their K9 gave a positive indication to the odor of narcotics. Sure enough, inside Mr. Smith's truck, police found the 17 gallons of PCP—destined for Hancock in the DMV area—from a black lock box located in the bed of the truck.

During the investigation, law enforcement obtained the following results _before_ the indictment return and arrest operation, which presents a snapshot of the drug trafficking organization's activities and its inherent dangerousness to the community:

- Narcotics recovered:  fentanyl, PCP, methamphetamine, and cocaine;
- Controlled buy drug totals:  Approximately 905 grams of fentanyl, and 1,815 grams of PCP;

- Drug seizure totals, unrelated to controlled buys: Approximately 17 gallons of PCP, 44.101 grams of fentanyl, 26.095 grams of methamphetamine, and 38.89 grams of cocaine; and
- One firearm recovered.

### August 26, 2025 Arrest and Takedown Operation

On August 21, 2025, following the above-referenced indictment return, arrest warrants for the eight defendants were issued. On August 26, 2025, law enforcement conducted a joint operation to execute the arrest warrants and residential warrants in 20 locations (including residences in Maryland and California), and several vehicular searches; the results were overwhelming, as reflected in the below table and photographic display. These recoveries exemplify the risk of harm to the community that flows from the defendants' ready access to firearms and fatal drugs.

| ADDRESS and/or VEHICLE | ASSOCIATIONS and/or DEFENDANTS PRESENT | EVIDENCE SEIZED[9] |
|---|---|---|
| 2926 Knox Place SE Apt. 102 | Prather | <ul><li>Glock 42, s/n: ADAX016 (loaded/chambered)</li><li>32.94 grams of white chunky powder identified as cocaine and methamphetamine</li><li>Mossburg model 88 12-gauge shotgun (loaded)</li><li>31.93 grams of PCP in glass vials</li><li>8.65 grams of fentanyl in a plastic bag</li><li>10.03 grams of cocaine or cocaine base in a plastic baggie</li><li>24.94 grams of fentanyl in a plastic baggie</li></ul> |

---

[9] Unless otherwise noted, all weights for narcotics in this chart include packaging. Additionally, unless otherwise noted, when a particular substance is identified as a specific narcotic, this reflects the results of field testing and all results are considered preliminary pending final testing from the DEA Mid-Atlantic Laboratory.

| 2474 Alabama Ave SE Apt. 101 | Prather | <ul><li>Mylar bags containing suspected marijuana (total gross weight 968.1 grams)</li><li>55.95 grams of cocaine base in a plastic bag containing cocaine base</li><li>146.26 grams of fentanyl-laced counterfeit oxycodone pills stamped M-30 in a plastic bag</li><li>Revolver pistol (loaded)</li><li>56 grams of eutylone powder in a plastic bag</li><li>Plastic bag containing white powder testing positive for cocaine, fentanyl and methamphetamine (total gross weight 74.02 grams)</li><li>Large rock of cocaine base, weighing 261.59 grams</li><li>$4,141 US Currency</li><li>Mylar bags containing 142.79 grams of suspected marijuana</li><li>Multiple bags containing, in aggregate, 1.5 kilograms of suspected marijuana</li><li>Paper plate with white rock substance and copper balls (weighing 112.27 grams and pending testing)</li></ul> |
| 1949 Naylor Road SE Apt. 201 | Riley | <ul><li>Taurus Handgun (loaded and chambered)</li><li>Glock 21 handgun (loaded and chambered)</li><li>AR Style Rifle (loaded and chambered)</li><li>Pyrex measuring bowl with spoon and residue</li><li>Baggie containing 33.8 grams of fentanyl (pending testing)</li><li>Plastic bag containing 151.02 grams of cocaine</li></ul> |

| | | |
|---|---|---|
| | | • (pending testing)<br>• Small baggies containing, in total, 227.58 grams of fentanyl<br>• Plastic bag containing 37.89 grams of cocaine base (pending testing)<br>• White brick of cocaine powder (pending testing), weighing 822.2 grams<br>• Multiple digital scales<br>• Approximately $17,000 in US Currency |
| 4228 Benning Road NE, Apt. 102 | Edwards | • Backpack containing cocaine or cocaine base (pending testing)<br>• Approximately $8,250 in US currency<br>• Clear baggie containing 131.51 grams of cocaine base (pending testing), with accompanying scale<br>• 222.34 grams of marijuana in three bags<br>• Clear bag containing 335.96 grams of cocaine base (pending testing) |
| 2921 Knox Place SE Apt. 201 | Missouri | • 88.91 grams of fentanyl from open plastic bag near toilet<br>• 1.3 kilograms of marijuana in baggies within black backpack<br>• 140.36 grams of fentanyl in baggies within black backpack<br>• 290 grams of PCP, in vials, within black backpack<br>• Black Draco s/n PMD 10631-19 (loaded and chambered) |
| 1000 12th St SE Apt. 501 | Rawlings | • Taurus PT 738 S/N 15250D handgun with ammunition<br>• Taurus pistol G3C with |

| | | |
|---|---|---|
| | | • ammunition<br>• 33.53 grams of cocaine in vial<br>• 43.24 grams of cocaine in assorted storage containers<br>• $14,208 in U.S. currency<br>• Vehicle search: 971.78 grams of PCP in vials, 81.22 grams of cocaine |
| Anthem House<br>900 E Fort Ave, Apt. 816 | Hancock | • Kilo pill press |
| 11235 Oak Leaf Drive, Apt. 1413 | Lassiter | • Digital scale with white powder residue |
| 16613 Strategy Place | Thomas | • Approximately $26,000 in U.S. Currency<br>• 9mm handgun<br>• .22 caliber derringer pistol<br>• Money counter<br>• Can sealer and cans<br>• Samples seized from possible PCP processing equipment |



**ARGUMENT**

Due to the charged offenses, the defendants are presumptively dangerous under Section

3142(e)(3)(A), and in Prather's case, Section 3142(e)(3)(B), too.  The United States respectfully

submits the defendants cannot rebut the presumption in favor of their detention, and there are no

conditions of release adequate to reasonably assure the community's safety.  Therefore, this Court

should detain the defendants pending trial.

    A.    **The Nature and Circumstances of the Offense**

The nature and circumstances of the charged offenses weigh strongly in favor of detention.

In the case of the indicted defendants, the grand jury found, by probable cause, that all eight were

engaged in a drug trafficking conspiracy since July 2024, to distribute fentanyl and PCP. As for the defendants charged by complaint, Missouri and Rawlings are alleged to have participated in the fentanyl and PCP trafficking conspiracy. Rawlings and Prather are both additionally charged with firearms-related offenses, and as illustrated by the seizure chart *supra*, there is a high likelihood of additional criminal exposure by virtue of a superseding indictment.

As explained above, Prather and his coconspirators essentially commandeered an entire portion of a local community in D.C. and therein established an open-air drug market. What's more, the quantities and types of narcotics involved in this conspiracy are of particular concern; fentanyl and PCP are notorious for devasting local communities, causing overdose deaths (particularly fentanyl), and provoking violence. *See, e.g., United States v. Glasglow*, 2021 WL 2403136, at *7 (D.D.C. Jun. 11, 2021) (Lamberth, J.) (noting that two milligrams of fentanyl can be fatal).

Fentanyl specifically is a potent synthetic opioid approved by the Food and Drug Administration for use as an analgesic (pain relief) and anesthetic. It is approximately 100 times more potent than morphine and 50 times more potent than heroin as an analgesic.[10]  As reflected in the statutory mandatory minimums for fentanyl distribution, Congress recognized the danger of this particular drug, which is responsible for a national opioid crisis resulting in a considerable increase in fatalities.  The statistics regarding the dangers of fentanyl, and its impact in Washington D.C., are staggering. A report issued by the D.C. Office of the Chief Medical Examiner ("OCME"), dated September 19, 2024, shows opioid-related overdoses increased dramatically from 2014 until 2023.  As discussed in the report, in 2023, there were 523 opioid-related fatal overdoses with an

---

[10] Drug Enforcement Administration, Fentanyl Fact Sheet, https://www.dea.gov/factsheets/fentanyl, (last visited August 28, 2025).

average of 43 deaths per month.[11]  While the term "opiates" include fentanyl and its analogs, morphine, heroin, and other types of drugs, the OCME also discovered that in 2023, over 96% of these overdose deaths involved fentanyl.[12]  Beyond D.C., fentanyl continues to have a devastating impact on the local and national community.  According to the Drug Enforcement Administration, "[m]ore than 107,000 people lost their lives to a drug overdose in 2023, with nearly 70 percent of those deaths attributed to opioids such as fentanyl."[13]

Similarly, while not as deadly as fentanyl, the proliferation of PCP in the District of Columbia has had devastating effects.  "PCP is classified as a hallucinogen and induces distortion of sight and sound, while producing feelings of detachment."[14]  It "produces feelings of invulnerability and a numbing effect on the mind that can often result in anger and rage," and in higher doses can include "reduced sensitivity to pain[.]".[15]  Unsurprisingly, users of PCP "may act strangely or become aggressive and violent."[16] Beyond the escalation of violence in the community caused by the dissemination of fentanyl and PCP, release of the defendants poses a separate, independent danger to the community through their drug trafficking and the concomitant violence.

The gravity of the charges against the defendants are reflected in their exposure to steep periods of incarceration. Based on the narcotics conspiracy charge alone, each defendant (except

---

[11] *See* D.C. Office of the Chief Medical Examiner, Opioid-related Fatal Overdoses: January 1, 2018 to June 30, 2024 (September 19, 2024), https://ocme.dc.gov/sites/default/files/dc/sites/ocme/Opioid-Related%20Fatalities_Sep2024.pdf (last visited July 16, 2025).

[12] *Id.*

[13] Drug Enforcement Administration, Overdose Deaths Decline, Fentanyl Threat Looms (December 16, 2024), https://www.dea.gov/press-releases/2024/12/16/overdose-deaths-decline-fentanyl-threat-looms#:~:text=More%20than%20107%2C000%20people%20lost,to%20opioids%20such%20as%20fentanyl. (last visited July 16, 2025).

[14] Drug Enforcement Administration, PHENCYCLIDINE (March 2025), https://deadiversion.usdoj.gov/drug_chem_info/pcp.pdf (last visited August 28, 2025).

[15] Metropolitan Police Department, Understanding the Risks and Dangers of Phencyclidine (PCP) at 2 (March 2011), https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/PCP.pdf (last visited August 28, 2025).

[16] U.S. National Library of Medicine, Substance use - phencyclidine (PCP) (Review Date May 4, 2024), https://medlineplus.gov/ency/patientinstructions/000797.htm (last visited August 28, 2025)

for Hancock (fifteen) and Missouri and Rawlings (five)), faces a mandatory-minimum sentence of

ten years and up to life in prison, under 21 U.S.C. § 841(b)(1)(A)(iv) and/or (vi). Hancock faces

a mandatory minimum sentence of fifteen years when enhanced under 21 U.S.C. § 851 and up to

life in prison under 21 U.S.C. § 841(b)(1)(A)(iv) and (vi). Prather faces an additional mandatory-

minimum sentence of five years and up to life in prison if convicted of Count Two, charging him

with 18 U.S.C. § 924(c), which must run consecutively to any other sentence. Missouri and

Rawlings face a mandatory-minimum sentence of five years and up to forty years in prison under

21 U.S.C. § 841(b)(1)(B)(iv) and (vi).

Finally, the fact that law enforcement found multiple loaded firearms (including an AR-

style pistol, Draco pistol, and a shotgun), and narcotics when executing arrest and search warrants

on August 26, which are still being evaluated, renders likely the probability of a Superseding

Indictment that could subject the defendants to even higher penalties.

### B.    The Weight of the Evidence Against Each Defendant

The weight of the evidence against each defendant is robust and supports their detention as

follows:

    *i.*    *Thomas Hancock, Jr.  – Counts 1 & 7:*

As identified *supra*, Hancock's phone number is one of the three target telephone

numbers—to wit, Target Telephone 2, or TT2—authorized for interception over the course of this

investigation.[17] Having previously been charged and convicted following a prior wiretap

investigation conducted in the District of Maryland, for which Hancock is presently on supervised

release, Hancock learned to exercise more care with his unencrypted telephonic communications.

---

[17] At the conclusion of the initial and extension interception periods of TT1, investigative agents applied for and received authorization to intercept the wire communications of both Hancock (TT2) and Riley (TT3). The initial interceptions of TT2 and TT3's wire communications commenced on April 30, 2025, and concluded on May 29, 2025.

Nevertheless, intercepted communications, both of his TT2 and his coconspirators' phones, supplemented by additional evidence obtained through court-authorized warrants and other investigative methods, illustrate Hancock's orientation as a large-scale narcotics trafficker in the East Coast, operating out of Baltimore.

Through the controlled purchases conducted early in the investigation, discussed *supra*, investigative agents were able to identify Hancock as the source of supply to Prather's fentanyl (Lassiter) and PCP (Riley) suppliers. If Prather needed an immediate supply and one of the intermediate links in the chain was unavailable, Prather could contact Hancock directly. For example, during an October 15, 2024 controlled buy, the UC had requested both fentanyl and PCP, but Prather was only able to supply the fentanyl on that date.  During the buy itself, which the UC's recording device memorialized, Prather called Hancock on speaker phone, asking about the "deer parks," or PCP.  Hancock audibly responded that it would likely be ready the following week. Prather's call detail records reflect that Hancock, via TT2, was the individual he called to request PCP, as memorialized in the UC's recording.

As another example pertaining to fentanyl, on February 7, 2025, at 6:24 p.m., Prather called Hancock (TT1, Session 283), detailed below:

PRATHER: Hello

HANCOCK: What's up (unintelligible, or "UI")

PRATHER: What's up with you?

HANCOCK: Shit, fuck you doing?

PRATHER: Man you wild as shit. N**** I've been waiting for you for two days. I ain't doing shit.

HANCOCK: UI You know. You know I been sick as shit.

PRATHER: oh, see, I didn't know that. I ain't know. I ain't know. I ain't doing shit dog I was UI

HANCOCK: Yeah, I had that motherfucking uh, I had that motherfucking noro- norovirus shit.

PRATHER: That new shit.

HANCOCK: UI

PRATHER: Yeah go ahead, go ahead, go ahead. Yeah yeah damn. Well stay where you at then. UI don't need to come over here. I'm cool.

HANCOCK: Yeah man, shit fucked up. I'm on uh, I'm on the highway, Imma call you in like a uh. Imma call you in like an hour.

In context, Prather had been waiting on Hancock to contact him, but Hancock was sick and said he would call Prather in one hour. Later that evening, at approximately 7:05 p.m., Hancock's vehicle was captured on surveillance across the street from the 2900 block of Knox Place. One minute later, Hancock called Prather (TT1, Session 288):

HANCOCK: Hey sup man. I'm at the door cuz.

PRATHER: I'm right here. At the door.

HANCOCK: Alright, hold on one second. UI (Background noises)

Surveillance then captured a person who appeared to be Hancock getting out of the sedan and running to 2926 Knox Place SE before knocking on the door and being let in. Two minutes later, Hancock went back to the car and left the area. Approximately 40 minutes later, Prather called Hancock:

PRATHER: Hello?

HANCOCK: Yeah. Hey, what'd that n**** say?

PRATHER: He came back and bought another one n*****. I tested him one and he came back and bought the next one.

HANCOCK: Huh?

PRATHER: Yeah. I let him test it. He came back and spent $10 on me for the next one. I said hel-lo.

HANCOCK: How'd you say it. How. How'd he say it was though? You talking about that little jaunt?

PRATHER: Yeahhhh, UI. I put some on the straw, let him hit it. He said nephew, I gotta I'll call you in about 10 minutes. You know, you know. I'm gonna call you and let you know. He came back in 30 seconds and then spent his money on it.

HANCOCK: Alright, at least I do know it's cool.

PRATHER: I still got it though. Whenever you come I got it.

HANCOCK: Nah I just wanted to make sure it was right.

PRATHER: Oh man.

HANCOCK: Because I had took it back from a n****.

PRATHER: Oh man, where he at. Give him to me. He don't want it, I take that shit. Let me get it. But oh, see, you don't you don't probably serve me outta UI you know what I mean. Can't fuck witchu.

HANCOCK: So you saying...UI. uh...

PRATHER: Can't keep spoiling me cuz.

In other words, Hancock called Prather to ask how the product was. Prather gave someone a small amount of the product to test the quality ("let him test it"), and the person liked it so much, they came back within thirty seconds to buy more ("He came back and spent $10 on me for the next one."). Hancock had taken the product back from another one of his customers and gave it to Prather to test. Prather, who thought the quality was good, asked to take whatever the other customer didn't want.

These direct transactions are the exception, rather than the norm, however, as Prather more regularly sourced his fentanyl from Lassiter, who, in turn, obtained it from Hancock. For example, the next week, on February 13, 2025, at approximately 2:56 p.m., a black male matching the physical description of Lassiter and wearing a shirt like the blue Hill-Rom work shirt he often wore, left 2926 Knox Place SE. CSLI for Lassiter's cellphone placed the device in the area of Hancock's residence and stash house, the Anthem House, at 4:11 p.m. An interior covert camera

located within the Anthem House showed Lassiter entering Hancock's unit at approximately 4:13 pm. Approximately one hour later, at 5:33 pm, Lassiter called Prather:

> LASSITER: Oh I was . . .I Uhmm... Nah I was calling I been around there earlier today, I just came down the way to put some shit together…...but I locked the house back up tho.

> PRATHER: I need one, I ain't had none.

> LASSITER: I know I know that's why I was calling, cuz I went in the house, before I left, I locked everything up, uh put the money on the table and shit like that I made up there, and then I, rolled out but I'm boutta uh head back up that way.

At approximately 5:38 p.m., a covert camera located inside Hancock's apartment building captured Lassiter leaving Hancock's unit almost immediately after he called Prather. CSLI for Lassiter's cellphone showed him leaving the area at approximately 6:00 p.m., driving towards D.C., and arriving to the 2900 block of Knox Place at approximately 7:22 p.m. A review of the camera capturing 2926 Knox Place SE showed Lassiter entering the building at approximately 7:27 p.m., to fulfill Prather's order.

But as borne out by the evidence surrounding the March 27, 2025 controlled buy, detailed *supra*, when Lassiter could not supply Prather with fentanyl before a controlled buy, Prather directly contacted Hancock to obtain the fentanyl, which Hancock transported from his residence and stash location at Anthem House to Prather's stash location within 2926 Knox Place SE Washington, D.C.

The March 2025 PCP interdiction outside of Topeka, Kansas, detailed above, illustrates Hancock's orientation within the charged conspiracy. Hancock was Prather's primary supply of fentanyl, and to a lesser extent, PCP. But beyond his direct supplying of Prather, Hancock purchased 17 gallons of PCP from Thomas, which was intercepted by law enforcement while Defendant-7 was transporting it across the country. The evidence firmly placing Hancock in the middle of this conspiracy includes intercepted wire communications of Hancock and Prather's

cellphones, surveillance from Hancock's apartment building in Baltimore, Maryland and from the 2900 block of Knox Place SE, returns from Hancock's iCloud account, Hancock's travel records, along with additional evidence.

As alluded to at the beginning of this section, Hancock's prior drug trafficking conviction also involved Title III wiretaps, and thus, Hancock rarely conversed over non-encrypted applications during the TT2 interception period. For example, on May 16, 2025, in Session 388 with an unidentified co-conspirator, Hancock advised the unknown male against speaking over the phone:

> HANCOCK: Yo
>
> UM: What you doing?
>
> HANCOCK: I ain't doing shit
>
> UM: Aight look look look… now this is, now listen, this the play this what we gotta do you hear me?
>
> HANCOCK: Yeah you know you want, you know you out there in the open field right now
>
> UM: Uhhhh damn how you want me talk to you?
>
> HANCOCK: You might as well go on what's a name, that jaunt that jaunt ain't got the audio?
>
> UM: I'm Android
>
> HANCOCK: Hit me on the uhh on the uhh on the uh IG then

Here, when discussing a potential "play," Hancock advised his associate against talking "in the open field" where a conversation can be intercepted. He suggested talking on FaceTime, which is borne out by Hancock's iCloud returns, discussed *infra*, and when the associate says he can't revert to iCloud because he is on an Android, Hancock then recommended Instagram.

Nevertheless, sparse wire-tapped communications from Hancock's phone, as well as returns from Hancock's iCloud account revealed his participation in a deal to transport 17 gallons

of PCP from Thomas. From Hancock's iCloud returns, investigators located separate message threads between Hancock and Thomas, and Hancock and Smith. Based on the message threads, from around December 2024 and continuing through the interdiction of the 17 gallons of PCP in March 2025, Hancock, with the financial assistance of Smith, arranged for Thomas to procure and Defendant-7 to transport bulk quantities of PCP from California to Hancock in Baltimore, Maryland.

In December 2024, communications between Hancock and Smith show them planning to fly to Los Angeles for a meeting with Thomas and several others. On December 9, 2024, Hancock messaged Thomas stating, "wsup slim I'll be out there in a couple of days hotel an flight is booked." Thomas responded, "Ok waiting on you" and Tapbacked "love" to Hancock's message.

On December 11, 2024, Smith messaged Hancock the flight and hotel information for their Los Angeles trip, scheduled for December 12, 2024. Leading up to the planned travel, Hancock and Smith discussed the necessity of Smith obtaining $100,000 from bank accounts before the travel date, including cash and cashier checks. Below are messages between Smith (using the number ending in -0025) and Hancock from December 11, 2024.



Later that day, Smith indicated that she would be "clearing Safe out," or taking out all the money from her account with Safe Federal Credit Union. Hancock's response again appears to reference the necessity of obtaining $100,000, while also referencing $70,000 that was already taken to California.

After arriving in Los Angeles, on December 13, 2024, Hancock provided Thomas with the address of the hotel Hancock and Smith were staying at. The next day, December 14, 2024, Smith asked Hancock, "What time did you tell your partner? I should be at the hotel by 4:30". Hancock responded, "I didn't," "I told u I'll just wait for u to get here I'll be around the corner at cal grille meeting wit the two homies," and "U should be close by." In other words, Hancock was meeting with Thomas and likely one other individual, and Smith was likely meeting with Hancock.

Three months later, in March 2025, Hancock hosted Thomas in Baltimore to complete the PCP transaction.  Hancock's iMessages and American Airlines flight records show that Thomas

flew from Ontario, CA to Baltimore, MD from March 25 to 26, 2025.  Similarly, cell site location information for Hancock's cellphone placed the device at BWI consistent with Hancock picking up Thomas from the airport, and the Anthem House covert camera captured Hancock returning to the building with a rolling suitcase and a black male in tow.

At approximately 5:54 p.m. (ET) on March 26, 2025, Kansas police stopped Defendant-7 in a Dodge Ram 2500 pick-up truck. During the traffic stop, a K9 gave a positive indication to the odor of narcotics from the vehicle. Police completed a probable cause search, and found approximately 17 gallons of suspected PCP from a black lock box located in the bed of the truck.

 

Hancock's iMessage history shows that at approximately 6:30 p.m., Thomas messaged Hancock "Where you at," "How long before you bacc," and "Need to talk to you asp." These messages occurred less than an hour after Defendant-7's arrest. On March 27, 2025, Thomas asked Hancock to drop him off at the airport around 3 p.m. and the next day, Thomas messaged Hancock a link to the public jail records for Geary County, Kansas Arrest for the arrest of Defendant-7. On April 2, 2025, Hancock messaged Smith about Defendant-7's arrest by providing the link Thomas gave him.  During the conversation, Smith told Hancock "It's not on my route why are they moving in KY of all places without paperwork they shouldn't went the long way."  Hancock corrected her that they were in "Kansas," and Smith responded "Even worse" "And trump is giving people affiliated with drugs life.  He's trying to pass that new law."  Smith then asked, "Was that the truck you've been waiting for," to which Hancock "tapped back" and "emphasized" her text before the following exchange:

> ↘ Received
>
> **+12025690025**
> 4/2/2025 6:07:24.000 PM
>
> Well you don't listen to me I told you the easiest way to get what you need is put it on my truck and I'll count out the weight in my product but you didn't want my advice

> ↔ Unknown direction
> 4/2/2025 6:09:50.000 PM
>
> No I didn't want to risk you getting involved that would be the last thing I would want is u getting caught up in some shit like that if it was a way that u would be excluded then ok but if not it's not something im willing to risk

Several months later, on May 15, 2025, a TT2 wire communication intercepted between Hancock and M.M. detailed the apparent loss of product in Kansas.  In sum and substance, Hancock discussed a "major L" after someone was "pulled on I 70 coming through Kansas."

Hancock further stated, "I had a buck seventy invested in that bitch." M.M. asked, "They locked up?" Hancock responded, "The driver, the driver is. But they bond him out. You know I was, I switched over and started playing with the juice." Hancock's reference to having "…a buck seventy invested…" matches the numbers referenced in Hancock's discussions with Smith.

On August 26, 2025, Hancock was arrested at the Anthen House in Baltimore. The recoveries from inside the apartment corroborate his elevated role as a large-scale supplier, as a kilo pill-press utilized for pressing pills was found within his residence.

### ii.    *Eric Prather – Counts 1-8:*

The evidence against Prather is overwhelming, and includes numerous recorded conversations and text messages exchanged between Prather and a UC; approximately 18 recorded controlled buys made by Prather to the UC; a judicially-authorized wiretap of Prather's telephone, TT1, resulting in the interception of numerous incriminating conversations with his coconspirators and other customers during the authorized periods of February 5 to March 6, 2025, and March 10 to April 8, 2025; pole camera footage of Prather's movements around the 2900 block of Knox Place SE, particularly in relation to interactions with his coconspirators; and narcotics and firearm evidence seized on the date of Prather's August 26, 2025 arrest from two of his known stash locations, 2926 Knox Place SE, Apartment 102, and 2474 Alabama Avenue SE, Apartment 101, Washington, D.C. 20020, in addition to Missouri's residence where he also stored supplies.

*Recorded Conversations and Controlled Buys:*

As illustrated in the recounting of each of the controlled buys substantively charged in Counts 3 through 8 of the Indictment, the UC and Prather always spoke by telephone on recorded conversations to arrange every controlled buy and coordinate their meeting time and locations. In communicating with Prather to order more fentanyl and/or PCP, the UC exclusively used Prather's TT1 to communicate with him.

What's more, during the controlled buys, the UC always wore a recording device, which audially- and visually-recorded Prather selling the UC narcotics.  For example, on September 5, 2025, when the UC purchased 9.998 grams of fentanyl from Prather, the UC's camera captured Prather inside 2926 Knox Place, weighing the fentanyl on a digital scale and handing it to the UC.

 



Similarly, on February 11, 2025, during a controlled purchase of 27.98 grams of fentanyl and 169.44 grams of PCP, the UC's camera recorded Prather entering the UC's car.  Once inside, Prather exchanged an orange reusable cloth bag containing purple-colored powdered fentanyl, two glass vials of PCP, laundry detergent, dryer sheets, and a cloth rag for a brown paper bag containing $3,000.



*Title III Wiretap Evidence*

Most significantly, Prather's wiretapped conversations consist of devastating evidence against Prather as an incredibly active and well-known drug trafficker in the Knox Place neighborhood. Throughout the day, he incessantly received calls from countless customers requesting to meet him "on Knox" to purchase narcotics. Moreover, Prather's intercepted communications, particularly with Hancock, Lassiter, Edwards, and Riley, showcased his network of suppliers who supplied him with fentanyl and PCP in a pinch whenever necessary, as detailed supra.

Further his incriminating conversations with Missouri revealed the way he strategically spread his narcotics and supply by storing them, not only at 2926 Knox Place Apartment 102, but also in Missouri's residence on the same block, at 2921 Knox Place Apartment 201. Daily, Prather called Missouri and asked her to walk over supplies and/or drugs when needed, and she immediately acceded, as shown in the surveillance footage outside both her residence (2921 Knox Place SE) and Prather's (2926 Knox Place SE). Indeed, on February 11, 2025, when Lassiter called Prather at 8:23 a.m. (TT1, Session 826) to discuss, in part, their concern about nearby police presence, Prather told Lassiter he moved everything "across the street," consistent with the location

of Missouri's residence.

Further, his intercepted communications implicated him in the July 6, 2024 recovery of narcotics and a firearm in a vehicle he occupied. As explained above, a Kel Tec PF9 9mm handgun was recovered inside a car near Prather's seat in the front passenger seat. Also recovered were a significant amount of cash (approximately $6,311 between the gym bag and Prather's person) and drugs (cocaine, fentanyl, and marijuana), depicted below.



These items were all found within arm's reach from where Prather was seated in the car on the front passenger floorboard and in a bag on the seat behind Prather. In addition, while Prather was stopped with the woman driving the car, he claimed ownership over all these items at the time of his arrest, and once more, during a March 14, 2025 wire-tapped phone conversation (TT1, Session 4886), when he confirmed that the gun, drugs, and cash were all his, and he detailed his

efforts to evade responsibility for these seizures.

*August 26, 2025 Arrest and Stash House Seizures:*

The investigation, including intercepted communications and Prather's recorded communications to the UC, revealed at least three stash locations for Prather, which included Missouri's residence at 2921 Knox Place SE (where, according to intercepted communications and surveillance, he stashed supplies and narcotics for her to courier to him across the block when necessary). Sure enough, as previewed by Prather's intercepted communications, ample evidence of his narcotics trafficking were located at all three stash locations linked to him—2926 Knox Place SE Apartment 102; 2921 Knox Place SE Apartment 201; and his more recently obtained stash house, 2474 Alabama Avenue SE, Apartment 101—which is outlined in the chart on pages 30-33 *supra*.

iii.    *Reginald Lassiter – Counts 1, 3-7:*

The weight of the evidence against Lassiter likewise supports detention. Indeed, on September 11, 2024, he was the first identified coconspirator and upstream source of fentanyl supply to Prather. On September 11, 2024, when the UC entered 2926 Knox Place SE, he met Prather inside the building and requested 20 grams of fentanyl, but Prather relayed he did not have enough in that moment to complete the order, so he called Lassiter a few times, as reflected by Prather's call detail records. At 10:51 a.m., when Prather called Lassiter in the presence of the UC and placed the call on speaker phone, the UC's recording device captured Lassiter saying, "I'm on my way to the house right now to get it and head to you," estimating an 11:15 a.m. arrival. Around 11:32 a.m., surveillance on the 2900 block of Knox Place SE showed Lassiter's Hill-Rom Chevrolet work van arriving. Lassiter, wearing his work uniform, entered the 2926 Knox Place SE building where Prather and the UC were waiting. Lassiter and Prather then together entered

Prather's stash location at Knox Place, Apartment 101, leaving the UC waiting in the common area.  Once Prather returned to the common area where the UC was standing, Prather weighed the requested fentanyl and completed the sale with the UC while Lassiter remained in the doorway of Apartment 101, as reflected in the image below.



Overall, Lassiter supplied or facilitated a fentanyl supply to Prather for at least twelve of the eighteen controlled buys with Prather—including on September 11 and 24, 2024; October 3, 15, and 23, 2024; November 12 and 20, 2024; December 3, 2024; January 8, 2025; February 11 and 26, 2025; and March 27, 2025.  The approximate quantity of fentanyl sold in just those twelve controlled buys was 689.46 grams.

For each of these buys, a similar pattern unfolded—after the UC called Prather to schedule a controlled purchase of fentanyl, call detail records showed Prather calling Lassiter, consistent with coordinating a resupply of fentanyl before the scheduled buy.  Lassiter's CSLI corroborated by surveillance, showed Lassiter arriving at 2926 Knox Place SE to drop off the supply in time for Prather's controlled purchase with the UC.  Once Prather's phone communications were

intercepted, starting on February 5, 2025, the calls exchanged between Prather and Lassiter corroborated precisely what circumstantial evidence suggested—that Lassiter managed a stash house in Washington, D.C. alongside Prather and further supplied Prather with fentanyl, including fentanyl from Hancock, which was stored at Hancock's stash house and primary residence, the Anthem House in Baltimore, Maryland.

*October 23, 2024 buy (Count 3)*:

As detailed above, Lassiter supplied the fentanyl for the UC's October 23, 2024 purchase of 57.60 grams of fentanyl, transporting it from Hancock's Baltimore stash house to D.C. for Prather to sell the UC. This is corroborated by Lassiter's CSLI showing his device in the vicinity of Anthem House in Baltimore, Maryland before surveillance showed Lassiter leaving Anthem House around 8:22 a.m. CSLI showed him traveling to D.C. while toll records reflected his and Prather's numerous calls with one another. Around 11:09 a.m., Prather told the UC in a recorded call that, before completing the buy, he needed to "get it from my man" at Deanwood station. Sure enough, at 11:21 a.m., Lassiter's CSLI showed him in the vicinity of Deanwood station (near the BP gas station on Kenilworth Avenue), approximately six minutes before Prather then called the UC at 11:27 a.m., saying he was on his way to meet the UC for the sale.

*November 12, 2024 buy (Count 4)*:

Lassiter supplied Prather with the approximately 83.61 grams of fentanyl that Prather sold the UC for this buy. This is corroborated by CDR showing calls exchanged between Prather and Lassiter from 5:23 a.m. and 5:28 a.m.; and pole camera footage capturing Lassiter's arrival at Knox Place at 6:18 a.m. and him dropping something off in a Ford Fusion with no rear license plate, but on its front, the same license plate (MD 8AW9957) affixed to Lassiter's Hill-Rom van. Surveillance at his work site later in the day recorded him wearing similar clothing to what he

wore at Knox Place around 6:18 a.m.  Pole camera also showed Prather retrieving what Lassiter left him in the Ford Fusion, while on his phone, which CDR reflected was Prather's phone call with Lassiter.

*February 11, 2025 (Count 5)*:

As detailed *supra,* by the time of this controlled buy, Prather's TT1 intercepted communications confirmed Lassiter's role in the conspiracy as his comanager of Prather's stash house in D.C. and supplier of fentanyl in coordination with Hancock.  Once the UC requested the purchase the day before the scheduled buy, Prather and Lassiter spoke by phone, and Prather confirmed that Lassiter still had the "purple rain," referencing the powdered fentanyl ultimately sold to the UC, which was noticeably purple in color.  Later that evening, Lassiter called Prather (TT1, Session 733) to say, "we locked the trap up" before talking about the effect the purple rain had on their tester, Darren, who Lassiter described was "fried on the new shit we gonna have." Lassiter mentioned that Prather should check in on Darren when he's there because Lassiter locked Darren in.  Prather confirmed he would.  On the date of the buy, law enforcement intercepted Prather's call with Lassiter when Prather confirmed with Lassiter the meeting time with the UC; in response, Lassiter advised that he himself would be back at Knox around 1.

*February 13, 2025 Visit to Anthem House*:

On February 13, 2025, Lassiter's CSLI reflected his presence in the area of Hancock's stash house, the Anthem House in Baltimore, Maryland, where Hancock resided in Apartment 816. The covert camera installed at Hancock's stash house showed Lassiter entering Apartment 816, at approximately 4:13 p.m.  At approximately 5:33 p.m., Lassiter called Prather on TT1, and they discussed the following:

> LASSITER: Oh I was . . .I Uhmm... Nah I was calling I been around there earlier today, I just came down the way to put some shit together…...but I locked the house back up tho.

PRATHER: I need one, I ain't had none.

LASSITER: I know I know that's why I was calling, cuz I went in the house, before I left, I locked everything up, uh put the money on the table and shit like that I made up there, and then I, rolled out but I'm boutta uh head back up that way.

The covert camera showed Lassiter then leaving Apartment 816 at approximately 5:38 p.m., immediately after having concluded the above call with Prather.  Lassiter's CSLI showed him leaving that area around 6:00 p.m. and driving towards Washington, D.C., arriving at the 2900 block of Knox Place around approximately 7:22 p.m.  Pole camera on Knox Place showed Lassiter entering the trap house building on Knox Place.  At 8:03 p.m, Lassiter called Prather, asking where he was, and advising that he was upstairs; Prather responded that was walking into the building.  Put simply, the intercepted communications between Prather and Lassiter revealed that Lassiter was at Hancock's stash house in Baltimore to obtain a resupply before heading back to the Knox Place stash house, where he met Prather later that evening.

### February 26, 2025 (Count 6):

Once again, intercepted communications crystallized Lassiter's role as a coconspirator and fentanyl supplier to Prather.  Intercepted communications between Lassiter and Prather from the morning of the buy included Prather's request of Lassiter for 3 ounces of fentanyl and their coordination of when and where they would meet before Prather planned to meet the UC.  Surveillance showed Lassiter's arrival in his Hill-Rom work van at the 2900 block of Knox Place around 11:52 a.m.  He left soon thereafter, around 12:30 p.m.

### March 27, 2025 (Count 7):

As detailed above, Prather turned to Lassiter to provide the 2 ounces of fentanyl prior to the controlled buy.  This time, Lassiter personally was unable to complete the supply, so he instructed Prather to get with Hancock, a/k/a "Fresh" for the fentanyl.  Ultimately, Hancock coordinated with Prather to drop off the fentanyl at Knox Place around 5:39 p.m. on March 26,

2025. The next morning, Lassiter called Prather to confirm he was able to get the fentanyl from "Fresh" and instructed Prather to weigh it and mix it, observing that there "will be some purple shit on top."

iv.    *Leonard Edwards – Counts 1, 5:*

As detailed *supra*, intercepted TT1 communications show Prather turned to Edwards for PCP for at least two controlled buys on February 11 and 26, 2025. Further, during the TT1 interception period from February 5 to March 6, 2025, and once again from March 10 to April 8, 2025, Edwards and Prather exchanged multiple calls indicative of Edwards supplying Prather.

On the date of the February 11, 2025 controlled buy, referenced *supra*, Edwards told Prather at 10:53 a.m., that he was getting someone to pour it (the PCP) before heading over to Prather, which pole camera footage reflected when Edwards entered 2926 Knox Place at 10:59 a.m., and left almost immediately at 11:01 a.m. Around 11:41 a.m., Prather met the UC at the buy location in NE Washington, D.C., selling the UC, among other contraband, two glass vials of 169.44 grams of PCP, shown below.



On February 14, 2025, at 10:38 a.m., Prather's call to Edwards was intercepted (TT1, Session 1423). During the call, Edwards asked Prather whether he was "at the spot?" Once Prather confirmed, Edwards responded, "alright, I'm about to go bring the rest of that," before the call ended. On February 24, 2025, at 8:30 a.m., Prather called Edwards (TT1, Session 2952), asking him to "bring that shit," to which Edwards responded, "I ain't forget about it, I fell asleep."

On February 26, 2025, when the UC called Prather to schedule yet another controlled purchase of both fentanyl and PCP, Prather's first call for a PCP resupply was to Edwards (TT1, Session 3272, 3278). Edwards responded, "But I got you. I'm about to get on top of that now." Later in the day, though, Edwards called Prather to explain his difficulty in getting confirmation from his own supplier. At that point, Prather quickly turned to Riley to ensure he had sufficient product for the UC in time for the controlled purchase. Even though Edwards did not ultimately supply Prather for the February 26, 2025 controlled purchase, Prather's recorded call to the UC (TT1, Session 3286) identifying Edwards as his "light" PCP supplier evinces Edwards role in the conspiracy as among Prather's PCP suppliers.

On March 5, 2025, at 3:54 p.m. (TT1, Session 4201), Prather called Edwards saying he's "out here," and Edwards responded that he was on his way. The next day, at 5:35 pm, Edwards called Prather to discuss an apparent resupply unrelated to a controlled buy, and therefore likely destined for one of Prather's many other customers in the community. During the call (TT1, Session 4345), Edwards advised he was about to "grab about 5 of the joints." Prather asked whether "all of 'em the same like you had?" Edwards affirmed. One minute later, Prather called Edwards (TT1, Session 4346), asking if he wants "14 for them," to which Edwards responded yes, as that is what he himself paid. Later that evening, at 6:55 p.m. (TT1, Session 4362), Edwards called Prather to coordinate the drop-off. Prather, in turn, called Lassiter at 6:56 p.m. (TT1, Session

4363) to ask if Lassiter was "still in the spot," noting that Edwards was almost there, so Lassiter should not leave.  Lassiter responded that he was there and would not leave.  At 7:44 p.m., Prather called Edwards (TT1, Session 4364); Edwards told Prather he already left it there since he had to leave.  Pole camera footage from the 2900 block of Knox Place showed Edwards arriving at the location, carrying what appeared to be a box into the building of Prather's stash location.  At 10:06 p.m., Prather called Edwards (TT1, Session 4386), confirming that he "got the shit."

On March 13, 2025, Prather called Edwards at 7:43 p.m. (TT1, Session 4799); Edwards told Prather that "[his] man had some more of that, uh, shit . . . he sent me a list. He said he got 5 of the joints that you just got."  Edwards told Prather that he would "grab that shit tomorrow." Prather told Edwards to reach back out to him the next day, and Edwards confirmed he would.  On March 18, 2025, Edwards called Prather at 1:27 p.m. (TT1, Session 5387), saying he was about to walk up.  Pole camera in the 2900 block of Knox Place showed his arrival at 1:25 p.m. in the parking lot across from the building.  He was then captured exiting his vehicle carrying what appeared to be an approximately eight-ounce bottle of amber liquid, consistent with PCP, as he walked into 2925 Knox Place SE around 1:28 p.m.  He left the building soon thereafter, at approximately 1:41 p.m.  Similar conversations between Prather and Edwards indicative of Edwards supplying Prather continued to occur throughout the extended interception period of TT1, which ultimately concluded on April 8, 2025.

Beyond the controlled purchases, Prather's intercepted communications with Edwards on March 18, 2025, show Edwards also appears to cook and sell cocaine base, too.  Specifically, on March 18, 2025, at 7:23 p.m., Edwards called Prather (TT1, Session 5431), saying he needed to "find somewhere to do this cuz."  Edwards reassured Prather, "I got you" but "I gotta find somewhere to do this shit cuz… I got it already. You know what I'm saying? But my man that

normally do it, he out of town working." Prather responded that he knew someone at 2926 Knox Place with a microwave, stove, and electricity that works, which Edwards could likely use. Prather called Edwards back (TT1, Session 5543), notifying Edwards that "it's a go," and he should not have to ask; he has a spot at 2926 Knox Place every time. Pole camera on the 2900 block of Knox Place captured Edwards arriving on the block, exiting his vehicle with a white grocery bag, and entering the building of one of Prather's stash locations.

       *v.*     <ins>*Darryl Riley, Jr. – Counts 1, 6:*</ins>

As detailed above, TT1 and TT3 communications, combined with pole camera at the 2900 block of Knox Place, revealed that Riley was among Prather's PCP suppliers, particularly of "dark" PCP. Following the February 11, 2025 controlled buy, Prather's February 12, 2025 intercepted communications with Riley (TT1, Sessions 1063, 1094, and 1148) showed them coordinating Riley's resupply of PCP to Prather. Sure enough, in TT1, Session 1148, when Riley told Prather he was pulling up, pole camera showed one of Riley's two cars, the silver Toyota Camry, pulling up in front of Prather's 2926 Knox Place stash location. Prather then exited the building, leaned into Riley's car, and received from the driver a Mott's juice bottle with what appeared to be amber liquid.



Indeed, the approximately 120.72 grams of PCP that the UC ultimately purchased from Prather a couple weeks later, on February 26, 2025, was similarly packaged in a Motts juice bottle, as depicted below.



What's more, prior to that February 26, 2025 buy, Prather contacted Riley, asking for the "deers," or PCP. On that date, Prather first turned to Edwards for the PCP, particularly because the UC was specifically requesting the "light" PCP, but Edwards was unable to fulfill the order in time for the controlled buy, so intercepted calls showed Prather immediately pivoted to Riley, who was happy to oblige. At 1:07 p.m. on February 26, 2025, Prather called the UC and essentially identified during that intercepted call that Edwards was his "light" PCP supplier, and Riley was his "dark" PCP supplier. Specifically, he informed the UC in TT1 Session 3286, that he was unable to get the light PCP, consistent with his communications earlier in the day with Edwards. Prather said he did manage to get the "dark" PCP, though, and he bought everything from his supplier, *i.e.*, Riley, so he was able to sell the UC 6 ounces of the dark PCP, which the UC confirmed he would take.

Beyond the controlled buys themselves, TT1 and Riley's own TT3 intercepted communications showed that Prather periodically obtained PCP resupplies from Riley. For example, on April 7, 2025, at approximately 10:45 a.m. and 11:36 a.m., TT1 Sessions 8043 and 8048 consisted of calls between Prather and Riley, during which Prather said he "has nothing, and that shit, the juice, is hella low right now." Much like "deer park" and "deers," the phrase, "juice" is a common street term for PCP. In response to Prather's request, Riley said he was "right up the street" and could pull up on Prather. Around 11:36 a.m., Riley called Prather to say he was there, and surveillance captured Riley arriving in the area of Knox Place before passing along the bag to one of Prather's associates who lives in the building.

Once interceptions of Riley's TT3 commenced from April 30 to May 29, 2025, Prather and Riley continued to call one another almost every other day,[18] consistent with Riley meeting Prather to resupply him. And on May 22, 2025, Riley called Prather around 3:37 p.m., after they had already met on May 21; during that call, Riley relayed that the money Prather provided was "350 short." Prather assured Riley he would get Riley the money as soon as he saw him.

The TT3 interceptions further evinced that Riley had his own customer base; every day he received calls from prospective customers seeking to meet him to purchase controlled substances. And on May 12, 2025 (TT3, Session 1228), when a customer called Riley while Riley was out of town and unable to sell anything to customers in the DMV area, he referred the customer to Prather, promising to text her Prather's phone number.

vi.    _Gerrika Missouri:_

The evidence of Missouri's role in the drug trafficking conspiracy as Prather's confidant in both storing and fulfilling customer orders in and around the 2900 block of Knox Place was supported by the recoveries from her residence on August 26, 2025. Early in the initial TT1 interception period, agents were able to identify where Prather stored at least some of his narcotics: with Missouri at her apartment across the street, _i.e._, 2921 Knox Place SE. For example, on February 9, 2025, beginning at approximately 10:40 a.m., law enforcement intercepted a series of wire communications between TT1 and Missouri. In addition to a review of technical surveillance and surveillance video from the apartment building 2921 Knox Place SE, Missouri can be observed coming to and from 2921 Knox Place SE and 2926 Knox Place SE. To this end, over multiple intercepted sessions (including Sessions 1111, 1502, 1503, 1929, 2545, and 2715, which represents

---

[18] Based on TT3 intercepted communications, Prather and Riley exchanged calls with one another to arrange to meet one another on May 2, 3, 5, 7, 10, 13, 14, 16, 19, 21, 24, 26, and 28, 2025.

a non-exhaustive list), Missouri and Prather used the term "girl scout cookies," likely referring, based on context and physical recoveries, to a larger quantity of narcotics that can be broken down into smaller, distribution-size quantities.

Missouri also appeared to store PCP. For example, on February 9, 2025, at approximately 10:40 am, in TT1 Session 522, Prather placed an outgoing call to Missouri, excerpts of which are reproduced below:

> PRATHER: Hey, you woke? Oh. Can you bring them waters over here for me?  Just one of them. I'm a little thirsty."
>
> MISSOURI: You said can I do what?
>
> PRATHER: Can you bring the water over here for me? Just one. I'm a little thirsty. I left it in the refrigerator.

Almost immediately thereafter, at 10:43 am, Missouri was observed exiting the exterior door of 2921 Knox Place SE carrying a black grocery bag. She then entered Prather's apartment building at 2926 Knox Place SE and left soon thereafter still carrying a black grocery bag. Prather then called Missouri at 10:47 am (Session 526), and the following exchange occurred:

> MISSOURI: It's in the, the green bag?
>
> PRATHER: (speaking low): I don't even know. Just look in there and see if you see a little sandwich bag box UI sandwich bag box got tape on it though. I I think there're three; there should be three of them little.
>
> MISSOURI: I got it. I see it.
>
> PRATHER: Okay. Bring me one. That's all.

Missouri then returned to 2926 Knox Place four minutes later, with a black grocery bag in hand, entered the apartment, and then returned to 2921 Knox Place with no grocery bag in hand.

The same day, at approximately 12:41 pm (Session 536), Prather called Missouri and requested that she bring, "Uh, hey, that other stuff that Darren like," "Yeah; bring the cake mix that Darren like," and "The one in the short bag." As referenced *supra*, the investigators know

Darren as an individual addicted to drugs who Prather, Missouri, and others use to test their narcotics on before selling to customers. At approximately 12:45 pm, Missouri exited the exterior door to 2921 Knox Place SE. Missouri was observed entering 2926 Knox Place SE and returning to 2921 Knox Place SE. Then, a little over an hour later, Prather called Missouri again, at approximately 2:05 p.m. (Session 544). During the call, Prather stated, "I need you to bring the shit Darren like. All of it." and "It should be a brand new one (UI). Like what you brung me? It's another one. That wasn't in there. I just don't remember what bag it was in." Missouri once again immediately obliged; at 2:09 p.m., Missouri exited the exterior door to 2921 Knox Place SE. Missouri was observed entering 2926 Knox Place SE and returning to 2921 Knox Place SE. This day's worth of exemplar intercepted sessions from TT1 is generally indicative of the daily rapport and interactions between Missouri and Prather.

Any doubt as to Missouri's knowledge of the objective of the conspiracy is belied by her own statements in intercepted calls. For example, in Session 5076 from the TT1 extension period, Missouri chafed when Prather suggested that she might not understand what product and quantity Prather needed:

> MISSOURI: What's going on? You around?
>
> PRATHER: Nah, I'm at Target with my son. I'll be around in a minute.
>
> MISSOURI: Oh nah I was just asking because I was about to get ready to leave. I was seeing if you needed something.
>
> PRATHER: Yeah but I'm not there. [Unindicted co-conspirator] is in there. But umm.
>
> MISSOURI: Do you want me to take something to [them]?
>
> PRATHER: I don't know if [they're] still in there. Uhh yeah. I'm gonna need some masks. When you coming back?
>
> MISSOURI: Do you need girl scout cookies?
>
> PRATHER: Yeah, yeah that's it. (interrupts Missouri) Nah that's it.

MISSOURI: I'm smart enough. I'll uh…I got you.

PRATHER: I don't need a lot though. Just not even a whole cookie. Just some little pieces of . . . (Missouri interrupts Prather)

MISSOURI: I know. I know. Exactly. I said I was smart enough. I've been around [a] little while now.

The recoveries from Missouri's residence at 2921 Knox Place SE on August 26, 2025, substantiate the evidence obtained over the course of the conspiracy. Indeed, as law enforcement entered her residence, it was readily apparent that Missouri had attempted to flush narcotics down her toilet. White powdery substance from the toilet was recovered, subsequently field tested at FBI Washington Field Office, returning a positive result for fentanyl. Law enforcement also recovered a loaded Draco-style handgun, approximately 108.98 grams of a white powdery substance, with packaging, which field tested positive for fentanyl, and approximately 160.75 grams of a brown powdery substance, with packaging, which field tested positive for eutylone.

vii.    _Melvina Rawlings:_

Rawlings operates in the 2900 block of Knox Place SE as a street-level supplier who directly coordinates with Prather (along with other street-level dealers in and around the 2900 block of Knox Place SE). This relationship became apparent to investigators early in the case, as in July 2024, when FBI agents introduced a confidential source into the 2900 block of Knox Place SE for the purpose of purchasing narcotics, Rawlings was one of the initial street-level suppliers with whom the CS interacted. When the CS solicited Rawlings for powdered fentanyl, Rawlings referred the CS to Prather to fulfill that product request.

Interceptions of TT1 further illustrate Rawlings and Prather's collaboration. On February 17, 2025, in TT1's Session 1957, Prather spoke at length with Rawlings about recent activity on the block, including drug trafficking. The following are excerpts from this lengthy session,

illustrating how Rawlings and Prather coordinated their trafficking in the 2900 block of Knox Place.

PRATHER: I know I am about to start going to my other spot. I got another spot. You can come around there with me. If you want to. But um…

RAWLINGS: Yeah…

PRATHER: I might sell, I might sell water two for ten though, just to turn that spot up. And then sell water one for ten after everyone start coming and shit. Not whole vials though. Like you know how they supposed to be? A little under, a little under that.

RAWLINGS: That why I was mad because this bitch [K.C.], I kept telling him, that he need um when he (unintelligible, or "UI"), I was like he need [K.C.] you need to tone that shit down a little bit like that. He was like, oh alright. So then I (unintelligible)-

PRATHER: He tryin -

RAWLINGS: I see this n**** was filling my shit up to the rim and shit, I was like what the fuck is you doin bro.

PRATHER: He trying to get all the sales

RAWLINGS: (UI)

PRATHER: He trying to get all the sales, that is why doing that. He want the sales to be like oh yeah I am going to him.

RAWLINGS: Yeah, every time I kept coming in the fuckin UI in there with you, I kept telling you look at him. Every time someone knock on the door, he coming right there. I'm like [K.C.], at the end of the day, he came in the trap just because he know that they going to knock on the door, and you would stand out front and smoke the shit and he could answer the door and take the money. That's why UI I'm like stay out here. The fuck. (UI).

PRATHER: I just made 6,000 dollars…

RAWLINGS: (UI) take some of my water

PRATHER: Look, I just made 6,000 dollars this weekend. I ain't worried about that little n****. **Laughter**

RAWLINGS: Shit I am. Fuck. Because he is trying to run out on my shit.

PRATHER: **Laughter**

RAWLINGS: (UI) No for real. Cause now, He (UI) and he came up there and was like, he came up there and was like, y'all um, what did he say, He was like y'all good? And I am

like, yeah he said one of you got the juice? I am like, both of us got some. So he was just, come on, he was just lookin around and shit. And I was like, Jose go ahead, you can go ahead. I said because that is like a whole thing, (UI) we all got the shit and bye. We all got shit and you don't like, me and Jose know how to take turns. [K.C.] act like he don't want to take turns. He wanna just run up and do what he want to do. At that point I am going to show you better than I can told you because then every time someone come in here, I am UI run your little ass down. Like fuck you.

PRATHER: Definitely, after a while. Yeah after awhile, he is going to be like I don't want to come in the hallway but I'ma have to. All they have to do is see my face. So.

RAWLINGS: Uh huh. UI act like you live here now I guess

PRATHER: UI Try to give him a place, try to give a chance to get some money UI

RAWLINGS: Yeah (UI) and everybody talking about it. Everybody talkin about he, he how he be just tryin to use the motherfucker try and get shit because that's how UI, they say you got to get your boy back over there, and he was like who? I was like [K.C.].

PRATHER: **Laughter**

RAWLINGS: He was like, man. I said yeah ain't no man shit. He need to get back to where his big brother, uh, cause he fucking shit up over here. (UI) boy you need to go back to work.

PRATHER: I am going to call you when I get around there though. I am on my way now.

This call is illustrative of Rawlings and Prather's relationship for several reasons. At the beginning of the conversation, Prather suggested moving to another location to begin selling PCP at two vials for $10 ("two for ten") to draw customers to the new locations. Once the spot becomes established, Prather would increase the price to one vial for $10 ("one for ten."). The conversation then changed to K.C., an unindicted co-conspirator, and the fact that K.C. was undercutting Rawlings and "Jose." Rawlings mentioned previously going to Prather to report to him what K.C. was doing. Prather's response revealed that he did not hold K.C. in high regard and was not worried about K.C. taking Prather's customers. The call also implies a hierarchy within the trafficking network in the 2900 block of Knox Place.

Rawlings continued to traffic narcotics in the 2900 block of Knox Place, based upon recent controlled purchases made from her. On June 12, 2025, at approximately 10:19 am, the UC called Rawlings to establish a meeting time, and Rawlings stated that she was "out" on the block. Twenty-five minutes later, the UC met Rawlings in the 2900 block of Knox Place. Rawlings accessed the back of a blue Toyota van with VA tags TDG3082—a vehicle previously observed by law enforcement in the vicinity of 2926 Knox Place SE—and provided the UC a half ounce (approximately 9 grams) vial of PCP in exchange for $160.

Five days later, on June 17, 2025, at approximately 10:25 am, the UC called Rawlings to establish a meeting time. Rawlings stated that she had an interview at 11 am and would call the UC after she finished. Approximately an hour later, the UC asked if Rawlings was available, and she said that she was back on the block. At approximately 12:06 pm, the UC made contact with Rawlings in front of 2926 Knox Place. The UC requested PCP and a sample of "down." Much as she did five days earlier, Rawlings once again accessed the backseat of the blue Toyota minivan and retrieved a glass bottle containing an amber colored liquid that contained approximately ten grams (a half ounce) of PCP. The UC then requested a sample of "down," and Rawlings then approached Terrance Boyd[19] seemingly in response to the requested sample of "down." Rawlings and Boyd interacted briefly before both entering 2926 Knox Place SE. Shortly thereafter, Rawlings exited 2926 Knox Place and provided a clear container with a white powdery substance to the UC, which tested positive for fentanyl and was approximately 0.5 grams.

Rawlings' continued activity was further corroborated by the searches of her residence and vehicle on August 26, 2025. In her residence, at 1000 12th Street SE, Apartment 501, law enforcement recovered two loaded handguns, one underneath her mattress, which she

---

[19] Boyd is charged in connection with this investigation in Case No. 25-mj-182.

acknowledged was hers, and one in a purse, approximately $14,208 in cash; approximately 33.53 grams, with packaging, of a white powdery substance in a brown-colored vial, which field-tested positive for cocaine; and approximately 43.24 grams, with packaging, of a white powdery substance in assorted storage containers with packaging. The white powdery substances field tested positive for cocaine.

Inside Rawlings' vehicle, a Mazda SUV, law enforcement recovered approximately 81.22 grams, with packaging, of a white powdery substance in assorted vials, which field-tested positive for cocaine; approximately 41.35 grams, with packaging, of a white powdery substance in two vials, which field-tested positive for cocaine; approximately 54.8 grams, with packaging, of a white powdery substance packaged inside purple/orange vials within a plastic bag, which field-tested positive for cocaine; approximately 785.33 grams, with packaging, of a white powdery substance in a baggy within a pink container, which field-tested positive for cocaine; and approximately 971.78 grams, with packaging, of assorted vials containing amber-colored liquid, which field-tested positive for PCP.

### C.    The History and Characteristics of the Defendants

At base, the history and characteristics of some of the defendants with minimal criminal is neutral given the longevity of their narcotics trafficking conduct. And for defendants with significant criminal history, like Hancock, this factor weighs in favor of detention.

### i.    *Thomas Hancock, Jr.:*

Perhaps more than any other defendant, Hancock's criminal history is significant by virtue of his prior conviction: a 2016 conviction in the Greenbelt Division of the District of Maryland. Then, like now, he was the lead defendant in a drug trafficking conspiracy. Then, like now, the investigation was advanced by the utilization of Title III wiretaps in which Hancock was

intercepted during his participation in the ongoing conspiracy. Then, Hancock was charged (and convicted) of conspiring to possess with the intent to distribute heroin. Now, Hancock is charged with conspiring to possess with the intent to distribute fentanyl, as well as PCP.

Beyond the clear parallels to Hancock's prior conviction and his presently alleged conduct, if the Court had any doubt as to Hancock's likelihood for recidivism, it also bears emphasizing that Hancock's presently charged conduct has transpired while he is on supervised release in the District of Maryland for his prior conviction.

ii.    _Eric Prather:_

At first blush, it appears Prather has minimal criminal history.  However, as referenced _supra_, on July 6, 2024, Prather was arrested and initially charged in Prince George's County, Maryland,[20] for his possession of a firearm and distribution-quantities of cocaine, methamphetamine, and blue pills containing approximately 44 grams of fentanyl.  But Prather's case was abruptly dismissed due to a clerical error that Prather described during a March 14, 2025 intercepted communication to a BOP inmate named, "Bone," who took Prather's call from a contraband phone.

During this call, Prather explained he was in a rental car that was overdue, and when the police pulled them over, he had a full stash on him, including, $6,400; a "pillowcase full of juice vials," meaning PCP; 11,000 pills; boot; 5 ounces of "yezzle bezzle" (likely referring to coke); 2 to 3 pounds of weed; and the "chicken biscuit" (from context, likely referring to the firearm). Prather explained he was charged with everything, including the gun, but his case was inadvertently flipped with a defendant charged in 1999 with the same case number.  Resultantly, Prather's case was expunged. Prather explained that he monitors any developments by paying the

---

[20] Case number D-05-CR-24-016573, filed on July 7, 2024.

other defendant monthly to ensure the case does not suddenly resurface.

Not only does this intercepted call explain why Prather's criminal history appears minimal, it further illustrates the lengths to which Prather went to evade law enforcement detection, which erodes confidence in his ability to comply with release conditions.

What's more, the evidence shows Defendant Prather did not confine his trade to dangerous narcotics. He conveyed to the UC his ability and willingness to facilitate the sale of firearms. On January 31, 2025, the UC expressed a desire to acquire firearms to help the UC's purported coconspirators selling Prather's fentanyl. Prather responded that he understood, offering to "work on it now." On February 3, 2025, at 12:13 p.m., the UC called Prather to remind him of the UC's need for firearms for protection. On February 10, 2025, at approximately 12:14 p.m., when the UC and Prather discussed meeting for a controlled buy the following day, Prather informed the UC that his firearms supplier would be back later in the day, so Prather would update the UC on the status of the firearm sale. Several hours later, at approximately 8:40 p.m., the UC and Prather spoke by phone again; during the call, Prather handed the phone to an unidentified male, who discussed his plans to purchase firearms for the UC. The male then returned the phone to Prather, who confirmed the amount of fentanyl and PCP the UC wished to purchase the following day, February 11, 2025.

During a June 26, 2025 phone call, the UC asked Prather what ever happened to his man who was prepared to sell the UC "tools," or firearms. Prather responded, "he's got them," describing the available firearms. When the UC asked Prather to pass along the UC's number to the firearm seller, Prather responded, "I got you bro," and promised to talk to his firearms source later that same day.

iii.   _Reginald Lassiter:_

Lassiter's criminal history is minor, with only one prior arrest, and is a mitigating factor for purposes of detention. Importantly, however, his criminal history does not fully capture the nature of Lassiter's role in the alleged conspiracy. His conduct was ongoing, it was continued, and it was of an elevated nature within the alleged hierarchy of the conspiracy. While this factor does not weigh in favor of detention, it does suggest that the charged conduct is not aberrational for the Defendant

iv.   _Leonard Edwards:_

Edwards' criminal history is also minor, though it is instructive to give context to his present charges. On December 30, 1997, Edwards was indicted for conspiracy to possess with the intent to distribute a controlled substance in Prince George's County, Maryland. Edwards ultimately pleaded guilty in April 1998, and was sentenced to a term of three years imprisonment, which was suspended. To Edwards' credit, since this conviction, his criminal history has been minimal, with his most recent arrest being a 2002 possession with intent to distribute marijuana charge in D.C. While this factor, at most, is neutral with respect to detention, it is still important to contextualize Edwards' ongoing participation in the instant charged conspiracy as conduct that is not wholly foreign to him.

v.   _Darryl Riley, Jr.:_

Riley is a convicted felon, with a prior conviction for possession of cocaine base with the intent to distribute it. The underlying facts of that prior conviction are as follows: in July 2012, a D.C. Superior Court search warrant was executed in the 1600 block of Q Street SE at the residence of a female associate of Riley's. During the search, approximately $4,700, a .22 caliber handgun, a larger sandwich bag containing what was later determined to be a crack rock, as well as a smaller

plastic bag containing 10 zips of crack were discovered in the residence. The facts of this prior search as compared to the searches of Riley's residences on August 26, 2025, are strikingly similar, with the primary differentiator being that Riley appears to have intensified his narcotics trafficking despite his prior felony drug conviction.

    *vi.*    <u>*Gerrika Missouri:*</u>

This is Missouri's first arrest, and her criminal history is a mitigating factor. Importantly, however, her criminal history does not fully capture the nature of Missouri's role in the alleged conspiracy. Her conduct was ongoing, it was continued, and she frequently stored and provided Prather with the narcotics with which he poisoned the community. What's more, as evinced by the recoveries from Missouri's residence on August 26, 2025, as detailed *supra*, her conduct over the course of the wire intercepts was not isolated. While this factor does not weigh in favor of detention, it does suggest that the charged conduct is not aberrational for the Defendant.

    *v.*    <u>*Melvina Rawlings:*</u>

Rawlings' criminal history suggests a recurrent pattern of violence, often involving weapons, making the discovery of a firearm underneath her mattress on August 26, 2025, unsurprising. Rawlings has two prior convictions for assaults with a deadly weapon, once in November 2004, and more recently, in April 2022. In the latter conviction, Rawlings stabbed two victims, one in the 2300 block of Ainger Place SE, and the other in the 2700 block of Bruce Place SE, each of which are blocks from the 2900 block of Knox Place SE. One of the stabbings sent the victim to the hospital with a severe stab wound to the middle of the victim's back on the right side.

Separately, this is not Rawlings' first narcotics-related arrest. In March 2012, she was convicted of a misdemeanor narcotics offense, which is concededly much less severe than the charges presently before the Court. Nevertheless, this prior conviction does establish a trend of

recidivism. Independent of her prior convictions, which prohibit her from possessing the firearm discovered underneath her bed, Rawlings has four prior fugitive warrants, suggesting a high likelihood of non-compliance with court-ordered conditions of release, were she to be granted bond.

### D.    The Danger to the Community

The United States respectfully submits that the defendants pose a significant danger to the community.  The presumption under Section 3142(e)(3)(A) establishes that narcotics trafficking is an "inherently dangerous activity."  *See United States v. Bethea*, 763 F. Supp. 2d 50, 54 (D.D.C. 2011) (Lamberth, C.J.).  The United States respectfully submits that the danger is magnified where, as here, the narcotics trafficked *in substantial quantities* is fentanyl and PCP.

Further amplifying the danger is the confluence of firearms with narcotics trafficking, which renders the areas afflicted by the defendants' conduct vulnerable to gun violence, among other ills.  Specific to this indictment, these dangers are not hypothetical, nor are they generalized as it relates to the area in and around the 2900 block of Knox Place SE. Over the course of the charged conspiracy, five homicides, amongst the other acts of violence detailed *supra*, occurred in the area where increasingly brazen open-air drug trafficking was conducted.  Put simply, the danger these defendants pose to the community cannot be understated, nor can they be mitigated by release conditions.

### CONCLUSION

For the reasons noted above, the United States respectfully submits that no condition or combination of conditions will reasonably assure the safety of the community.  Accordingly, the United States respectfully requests that the Court grant the United States' motion to detain each defendant pending trial in this case.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney


/s/
SITARA WITANACHCHI
MATTHEW W. KINSKEY
JOHN PARRON
D.C. Bar No. 1023007 (Witanachchi)
D.C. Bar No. 1031975 (Kinskey)
PA Bar No. 324503 (Parron)
Assistant United States Attorneys
Violent Crime and Narcotics Trafficking Section
601 D Street, NW
Washington, D.C. 20530

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 28, 2025, a copy of the foregoing Memorandum in Support of Pretrial Detention was submitted via CM/ECF, which will transmit to counsel for the above-captioned defendants.


*/s/ Sitara Witanachchi*
Assistant U.S. Attorney