**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 25-cr-241 (TJK)** |
| | : | |
| **MICHAEL ANDERSON THOMAS (6),** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Michael Anderson Thomas pleaded guilty to a Superseding Information charging him with Conspiracy to Distribute and Possess with Intent to Distribute One Kilogram or More of a Mixture and Substance Containing a Detectable Amount of Phencyclidine (PCP), in violation of 21 U.S.C. §§ 846, 841(a)(1), and (b)(1)(A)(iv) (Count One); and Possessing a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Two). For the reasons herein, the Government respectfully requests that the Court sentence the Defendant to an aggregate term of 195 months of imprisonment, specifically 135 months as to Count One and the 60 months required by statute as to Count Two, to be followed by five years of supervised release.

## BACKGROUND

In the Summer of 2024, law enforcement officers with the Federal Bureau of Investigation (FBI) led an investigation into a narcotics trafficking conspiracy centered around the 2900 block of Knox Place SE. The year-long investigation culminated in the return of an eight-count indictment on August 21, 2025, in *United States v. Thomas Hancock, et al.*, 25-cr-241 (TJK). During the investigation, law enforcement identified Eric Prather as a prolific fentanyl and PCP dealer with at least one stash house at 2926 Knox Place SE. From August 2024 through July 2025, law enforcement conducted twenty controlled buys of fentanyl and PCP, eighteen of which

occurred with Prather, resulting in multiple kilograms of fentanyl and PCP being interdicted in the lead-up to a coordinated arrest operation conducted in late-August 2025.

As the investigation progressed, law enforcement identified co-defendant Thomas Hancock as a large-scale distributor of fentanyl and PCP, amongst other narcotics, in the Washington, D.C./Baltimore Metropolitan Area based in Baltimore. Hancock was an East Coast-based bulk supplier of both fentanyl and, relevant to the Defendant's conduct, PCP. During court-authorized wiretaps of Prather's and Hancock's telephones, as well as other investigative methods, law enforcement was able to identify the Defendant as a facilitator of bulk shipments of PCP to Hancock, in collaboration with co-defendant Darrell Smith.

In order to conceal his drug trafficking, the Defendant established a shell company, "Never to Late Transportation, LLC" (herein, "Never to Late"), which was incorporated in the State of California in December 2022, with the Defendant and Darrell Smith listed as managers/members of the company. Financial analysis of the JP Morgan Chase bank account for Never to Late indicates that is a quintessential pass-through account, with nearly identical in-flow (approximately $260,218.45) and out-flow activity (approximately $261,876.83) over 2024-25 after its establishment in late-2023.

Specific to his relevant conduct within the charged conspiracy, beginning in late-2024, Hancock and co-defendant Sarda Smith brokered the sale of 17 gallons of PCP by the Defendant to Hancock, the delivery of which was to ultimately be made in March 2025. The structure of the transaction was as follows: Hancock and Sarda Smith transmitted payments via multiple methods, including peer-to-peer payment platforms and cashier's check to Never to Late. In total, from August 2024 to March 2025, Hancock and Sarda Smith facilitated the total payment of approximately $170,000, reflecting a price of $10,000 per gallon of PCP, to the Defendant,

primarily through Never To Late.

Specific to payments made by Hancock to Never to Late via Zelle, communications between Hancock and the Defendant make clear that the Zelle payments were made in connection with the 17-gallon purchase.

For example, on January 17, 2025, the Defendant messaged Hancock: "Wats the plan bro im trying to get this shit do I can do wat o need to fo and get on they side plus I trying to grab it before some one else do they said they was go hold it but I'm not trying to hold they money up I told them I would be there to grab it no later then Friday based off wst you was telling me my rite is all I got I can't be Pump faking with my people my word is all I have and I don't want to stop holding stuff for me when I need them to it's not easy to get this shit only a few ppl have the know how when it comes down to ordering this shit." The Defendant then followed up the same day: "I'm not trying to bug you I'm just trying to keep us in rotation." After receiving no response, on January 19, 2025, the Defendant said: "I put it off til tomorrow have to go to him wit atless 10 for me yo be able to owe him 2." Hancock then responded: "I'm gonna send it in one sec don't trip." In aggregate, from January 18-21, 2025, Hancock sent three payments totaling $10,000 via Zelle to Never to Late.

In late-2024, as part of the continued financing of the 17-gallon PCP transaction, Hancock and Sarda Smith travelled to Los Angeles. Sarda Smith obtained a $45,000 cashier's check from Safe Credit Union payable to the Defendant's business, ultimately needing to go twice, as the first check contained a typo ("Lake" rather than "Late"):


SAFE CREDIT UNION 2295 Iron Point Road, Suite 100 Folsom CA 95630-8765 (916) 979-7233 • (800) 733-7233
CASHIER'S CHECK 90-7374/3211 NO.230613
DATE 12-12-2024
PAY Forty-Five Thousand and 00/100 AMOUNT $45,000.00
TO THE ORDER OF Never To Lake Transport LLC
"NOT USED FOR PURPOSE INTENDED"
AUTHORIZED SIGNATURE
CHECK VOID AFTER 180 DAYS
BOFD SAFE CU 321173742
12/14/2024, 12:26:34
BATCH ID 44791, USER ID SAFE_FCU\ACASTILLO
tMagic ID 67273492444791
DO NOT WRITE, STAMP OR SIGN BELOW THIS LINE RESERVED FOR FINANCIAL INSTITUTION USE
"NOT USED FOR PURPOSE INTENDED"
ENDORSE HERE


SECURITY FEATURES: MICROTEXT IN SIGNATURE LINES AND AN ARTIFICIAL WATERMARK ON BACK.
SAFE CREDIT UNION 2295 Iron Point Road, Suite 100 Folsom CA 95630-8765 (916) 979-7233 • (800) 733-7233
CASHIER'S CHECK 90-7374/3211 NO.231227
DATE 12-14-2024
PAY Forty-Five Thousand and 00/100
AMOUNT $45,000.00
TO THE ORDER OF Never To Late Transport LLC
AUTHORIZED SIGNATURE
SECOND SIGNATURE REQUIRED FOR $10,000 AND OVER
CHECK VOID AFTER 180 DAYS
⑈231227⑈ ⑆321173742⑆34 2004122020⑈

The culmination of this transaction was to occur in late-March 2025, as Darrell Smith transported the 17 gallons of PCP from Los Angeles to Hancock in Baltimore, while the Defendant flew to Baltimore to meet Hancock and be present for the delivery of the PCP. To this end, on March 26, 2025, the Defendant flew from the Ontario International Airport to Baltimore-Washington International Airport (BWI). Upon his arrival to BWI, the Defendant messaged Hancock that he was "landing now". Soon thereafter, Hancock messaged the Defendant that he was "pulling up now" to pick up the Defendant from BWI.

The same day, on March 26, 2025, Kansas state police initiated a traffic stop of a Dodge Ram 2500 pick-up truck operated by Darrell Smith. Law enforcement officers completed a probable cause search of the Ram, resulting in the seizure of approximately 17 gallons of PCP from a black lockbox located in the bed of the truck. The PCP was packaged in 17 one-gallon cans that were each sealed and contained within the Ram's lockbox.





Less than one hour after the seizure of the PCP and Darrell Smith's subsequent arrest, the Defendant messaged Hancock: "Where you at," "How long before you bacc," and "Need to talk to you assp". The Defendant flew back to Los Angeles the next day, March 27, 2025. On March 28, 2025, the Defendant messaged Hancock a link to the public jail records for Geary County, Kansas related to Darrell Smith's arrest.

On August 26, 2025, the Defendant was taken into custody as part of a coordinated arrest operation conducted in connection with this investigation. After effectuating his arrest and securing the premises, the Defendant's residence in the 16600 block of Strategy Place, Chino, California was searched. In the residence, the Defendant was located and arrested, and the only other occupants of the residence were two juvenile males, who were subsequently identified as his sons.

During the initial walk-through, a strong chemical odor was detected in the garage. In addition to the strong chemical odor detected in the garage, in the rear of the residence, beyond the garage, an enclosed, standalone backyard shed was located, containing chemical production materials, multiple large-capacity trash bins, and associated paraphernalia. The clandestine PCP laboratory in the backyard and detached garage is depicted below.


Help


BRUTE

The DEA Los Angeles Area Clandestine Lab was summoned to collect samples and properly dispose of the materials, which were later determined to be precursors for PCP production. A HAZMAT cleanup company eventually conducted the chemical removal after samples were taken. At the conclusion of the search, the San Bernardino County Office of the Fire Marshal, Hazardous Materials Section, deemed the residence condemned due to the materials discovered therein.

In other locations throughout the residence, the following additional materials were discovered: (i) a blue bag containing approximately $26,000 in U.S. currency; (ii) a Walther Creed 9mm handgun and accompanying ammunition; (iii) a Derringer DM-22 .22 caliber handgun and accompanying ammunition; (iv) a Teraputics money counter; and (v) a Senior Master Can Sealer Model 1502, along with two empty metal cans and accompanying lids that were nearly identical in appearance to those discovered in the Ram in March 2025.



## STATUTORY PENALTIES

The penalties for a violation of Title 21, United States Code, Section 841(b)(1)(A) are as follows: a mandatory minimum sentence of 10 years imprisonment, with a maximum sentence of life imprisonment; a fine not to exceed $10,000,000, and a term of supervised release of no less than five years imprisonment.

The penalties for a violation of Title 18, United States Code, Section 924(c)(1)(A)(i) are as follows: term of imprisonment of not less than 5 years and not more than life and not more than life to be served consecutively to any other term of imprisonment imposed a fine not to exceed $250,000, and a term of supervised release of no greater than five years imprisonment.

## SENTENCING GUIDELINES

The Government concurs with the Pre-Sentence Report (the "PSR") that the applicable Guideline range as to Count One of the Superseding Information, after acceptance of responsibility, is 135-168 months, by virtue of the Defendant's criminal history category of I, with an applicable statutory mandatory minimum of 120 months imprisonment. *See* PSR, ¶¶ 58, 104.

The applicable guidelines for Count Two of the Superseding Information is set forth in U.S.S.G. § 2K2.4(b), which requires that the minimum term of imprisonment, 60 months, be imposed consecutively to any other sentence, pursuant to 18 U.S.C. § 924(c)(1)(A)(i).

## LEGAL PRINCIPLES

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in Title 18, United States Code, Section 3553(a). *See United States v. Gall*, 552 U.S. 38, 49-50 (2007). Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *United States v. Rita*, 551 U.S. 338, 348-50 (2007). The Section 3553(a) factors

include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment; (3) the kinds of sentences available; (4) the sentencing range established by the Sentencing Guidelines; (5) any related Sentencing Commission policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need for restitution to any victims.

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington*, 542 U.S. 296 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory. *Booker*, 543 U.S. at 245. Nonetheless, a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. *See Gall*, 128 S. Ct. at 598 ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark"). The Guidelines are the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions. *See Rita*, 551 U.S. at 338; *see also* United States Sentencing Comm'n, Supplementary Report on the Initial Guidelines and Policy Statements 16-17 (1987); 28 U.S.C. § 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 438 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases"). In addition, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines

in light of what it learns." *Booker*, 543 U.S. at 264 (the Sentencing Commission will continue "collecting information about actual district court sentencing decisions . . . and revising the Guidelines accordingly").

The Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). Any Guidelines calculation is based on the individual characteristics of the offense and the offender, as required by Section 3553(a)(1). The Guidelines themselves thus seek to implement—in a fair and uniform way—the offense specific characteristics that, themselves, comprise the "individualized assessment" the Supreme Court commends in *Gall*. *See Gall*, 552 U.S. at 50.

## ARGUMENT

An aggregate sentence of 195 months of imprisonment is appropriate in light of the seriousness of the offense. When considering the totality of the factors under Section 3553(a), as well as Congress' intent with imposing statutorily-prescribed mandatory minimum terms of imprisonment for certain drug and firearms-related offenses like the offenses to which the Defendant has pleaded guilty, an aggregate sentence of 195 months imprisonment appropriately reflects the seriousness of Defendant's offense, promotes respect for the law, provides just punishment, affords adequate deterrence, protects the public from further crimes of Defendant, and accounts for Defendant's history and characteristics.

### 1. The Nature, Circumstances, and Seriousness of the Offense

The criminal conspiracy in which the Defendant was implicated is incredibly serious. He is directly implicated in a fentanyl and PCP trafficking conspiracy that was responsible for the distribution of kilograms of fentanyl and PCP into the District of Columbia and elsewhere.

Here, the evidence shows that the Defendant was a wholesale PCP supplier. The Defendant

was sophisticated enough to incorporate a shell company with his co-conspirator, Darrell Smith, to conceal his drug trafficking operation. That company, Never to Late, received hundreds of thousands of dollars in pass-through funds, suggesting that the amount captured in that bank account was just a fraction of the Defendant's overall business.

In addition, the evidence found in the Defendant's home at the time of his arrest on August 26, 2025, five months after the Kansas seizure, demonstrates that his sale to Hancock was not a one-off, but was instead a part of the Defendant's large-scale operation. In addition to the approximately $26,000 found in a bedroom at Defendant Thomas's residence, law enforcement found containers fit to store PCP, a can sealer consistent with what was used to package the 17-gallons of PCP destined for Hancock in the DMV, a money counter, and a large store of what appears to be byproduct from the PCP-creation process. But in addition to this evidence of drug trafficking, law enforcement found two firearms—one in a bag containing a key card with the Defendant's name and picture on it, and one found in connection with the drug trafficking paraphernalia in the Defendant's garage.

The proliferation of PCP in the District of Columbia has had devastating effects. "PCP is classified as a hallucinogen and induces distortion of sight and sound, while producing feelings of detachment."[1] It "produces feelings of invulnerability and a numbing effect on the mind that can often result in anger and rage," and in higher doses can include "reduced sensitivity to pain[.]".[2] Unsurprisingly, users of PCP "may act strangely or become aggressive and violent."[3] Beyond the

[1] Drug Enforcement Administration, PHENCYCLIDINE (March 2025), https://deadiversion.usdoj.gov/drug_chem_info/pcp.pdf (last visited August 28, 2025).

[2] Metropolitan Police Department, Understanding the Risks and Dangers of Phencyclidine (PCP) at 2 (March 2011), https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/PCP.pdf (last visited November 12, 2026).

[3] U.S. National Library of Medicine, Substance use - phencyclidine (PCP) (Review Date May 4, 2024), https://medlineplus.gov/ency/patientinstructions/000797.htm (last visited November 12, 2026).

escalation of violence in the community caused by the dissemination of fentanyl and PCP, release of the defendants poses a separate, independent danger to the community through their drug trafficking and the concomitant violence.

Here, the nature and circumstances of the Defendant's offense establish that he was a large-scale PCP supplier. He incorporated an LLC in his state of residence to conceal his trafficking. A single seizure of his product resulted in the recovery of 17 gallons of PCP, which alone resulted in his overall offense level within the instant conspiracy. What's more, despite this seizure, the Defendant proved undeterred, found five months later in his residence with a clandestine PCP laboratory. His conduct is serious and merits a commensurate sentence.

**2. The Defendant's History and Characteristics**

With respect to the next 3553(a) factor, the Defendant's history and characteristics suggest an individual who is an unrepentant recidivist, despite the life-altering medical episode he experienced earlier this decade.

The Defendant's first federal drug trafficking conviction, though sufficiently dated so as to not impact his criminal history score, is still relevant to the Court's consideration under the 3553(a) factors. In February 1998, at the age of 21, the Defendant was arrested in Huntsville, Alabama, attempting to sell two kilograms of cocaine. When law enforcement attempted to interdict, the Defendant attempted to flee, running into one of the police cars blocking him in, trying to ultimately push the police car out of the way. PSR, ¶ 56. The vehicle was subsequently searched, the Defendant surrendered, and two kilograms of cocaine, along with a handgun, were recovered from the vehicle. The Defendant pleaded guilty in the Northern District of Alabama and was sentenced to 120 months in Bureau of Prisons (BOP) custody.

While in BOP custody, the Defendant incurred a second narcotics-related federal felony conviction. In July 2001, the Defendant and a co-conspirator conspired to smuggle balloons of

marijuana into FCI Sheridan, and 16 balloons containing a net of 33.1 grams of marijuana were ultimately recovered. PSR, ¶ 57. For this offense, the Defendant was sentenced in the District of Oregon to an additional 15 months of imprisonment, imposed consecutively to his Northern District of Alabama sentence.

Before then, the Defendant was convicted for illegally carrying a concealed weapon (a firearm) in 1997, battery with serious bodily injury in 1994, and attempted second degree drug trafficking in 1995. At bottom, the Defendant's prior convictions, including two prior federal narcotics felonies, show not only a history of engaging in serious drug trafficking and carrying illegal weapons, but of his inability to comply with the law even while incarcerated. While the Government agrees that the Defendant's criminal history score is properly calculated as zero in the PSR, the Defendant's history and characteristics, viewed holistically, merit a sentence within the recommended Guidelines.

**3. Other factors**

Given the catastrophic impact of drugs on our community, a sentence that corresponds with the recommended Sentencing Guidelines is appropriate to deter others from trafficking bulk quantities of one of the most addictive and potent narcotics trafficked within the District of Columbia and elsewhere. Too many people do not understand or fear the consequences to themselves or their community that flow from this behavior, and they must understand that their conduct is unacceptable.

Separately, the need to avoid unwarranted sentencing disparities likewise supports the United States' recommendation. Congress directed courts to avoid unwarranted disparities among similarly situated defendants, and the advisory Sentencing Guidelines remain the primary mechanism for promoting national sentencing uniformity.

**CONCLUSION**

For the foregoing reasons, the Government respectfully requests that the Court sentence the Defendant to an aggregate term of 195 months of imprisonment, specifically 135 months as to Count One and the 60 months required by statute as to Count Two, to be followed by five years of supervised release.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: /s/ *Matthew W. Kinskey*
MATTHEW W. KINSKEY
Assistant United States Attorney
D.C. Bar No. 1031975
United States Attorney's Office
Violent Crime & Trafficking Offenses Section
601 D Street, NW
Washington, D.C. 20530